307 Ga. 696
FINAL COPY

S19A1256. MANN v. THE STATE.

BENHAM, Justice.

David Mann, Jr., was convicted of malice murder and two counts of first degree cruelty to children in connection with the death of seven-year-old Ethan Martinez.[1] Following the trial court's denial of his motion for new trial, Mann appeals, arguing that the evidence

---

[1] The crimes occurred on September 18, 2012, and Ethan died as a result of his injuries on September 21, 2012. On December 7, 2012, a Newton County grand jury indicted Mann for malice murder (Count 1), felony murder predicated on aggravated battery — family violence (Count 2), felony murder predicated on cruelty to children in the first degree (Count 3), aggravated battery — family violence (rendering Ethan's brain useless by throwing his body to the ground) (Count 4), cruelty to children in the first degree (throwing Ethan to the ground) (Count 5), cruelty to children in the first degree (grabbing and squeezing Ethan's penis) (Count 6), and cruelty to children in the first degree (hitting Ethan on his back and buttocks) (Count 7). At a trial held from September 29 to October 2, 2014, a jury found Mann guilty of all counts. The trial court sentenced Mann as follows: life in prison on Count 1; 20 years on Count 6 (to be served consecutively to the life sentence); and 20 years on Count 7 (to be served consecutively to the other sentences). The remaining counts were vacated by operation of law or merged for sentencing purposes. On March 22, 2018, Mann moved the trial court for leave to file an out-of-time motion for new trial; the trial court granted the motion on that same day. Also on March 22, 2018, Mann filed a motion for new trial, which he amended twice. Following a hearing, the trial court denied Mann's motion for new trial (as amended) on February 19, 2019. Mann filed a notice of appeal to this Court, and this case was docketed to the August 2019 term and thereafter submitted for a decision on the briefs.

was insufficient to support his convictions; that the trial court committed reversible error in multiple instances; and that he was denied the effective assistance of counsel. Because we conclude that his claims are meritless, we affirm.

Viewed in a light most favorable to the verdicts, the evidence presented below established as follows.  In September 2012, Mann lived in a Newton County home with his fiancée, Dora Martinez, and her son, Ethan. On the morning of September 18, Dora woke early to dress Ethan, who was well and behaving normally when she left the house for work around 6:30 a.m. Shortly after 7:00 a.m., Mann placed a 911 call and reported that Ethan was unresponsive and vomiting and had soiled himself.

When first responders arrived, they found Ethan surrounded by a pool of vomit and unconscious but breathing. Ethan had signs of a head injury and had urinated and defecated on himself. Mann indicated to first responders that, two days earlier, Ethan had fallen from a playset and hit his head. Ethan was transported to the Newton County Medical Center, where a nurse observed a large

2

hematoma on the back of his head, bruising to his buttocks, and abrasions on his arms. A CT scan showed bleeding along the side of Ethan's brain, as well as brain swelling. Ethan was then transported to Children's Healthcare of Atlanta, where he was admitted with a traumatic brain injury. His other injuries included a circumferential bruise to his penis and scrotum, a bruised back, elevated liver enzymes, and retinal hemorrhaging in both eyes. Doctors eventually confirmed brain death, and Ethan was taken off life support on September 21.

Before Ethan was declared brain dead, Mann was driven by a relative to the Newton County Sheriff's Office for an interview. After ending the initial interview by requesting counsel, Mann was taken into custody on charges of cruelty to children and aggravated battery. During the booking process, Mann completed an inmate request form, indicating that he wanted to speak with officers again. During the second interview, Mann admitted to officers that he had "whooped" Ethan after learning that Ethan had not completed his homework. Using a doll, Mann demonstrated how he had "scooped

up" and held Ethan over his shoulder while spanking him; Mann also indicated that he may have inadvertently hit Ethan on the back during the spanking. According to Mann, he spanked Ethan "less than ten times" but admitted that he was "very strong and . . . didn't hit [Ethan] soft." Mann also admitted that, after he finished spanking Ethan, he "squeezed" Ethan between the legs because he "was mad"; he assumed that this squeezing caused the penile bruising. Mann said that he then "picked [Ethan] up in the air . . . [and] tried to throw him on the bed" but missed the bed and Ethan hit the ground. Mann reported that the back of Ethan's head hit the ground and then "his body like lifted up. Like he lifted his stomach up, like he was having a seizure or something."

At trial, Ethan's pediatrician testified that she saw Ethan for a regularly scheduled check-up on September 17, the day before the incident. She conducted a head-to-toe exam and observed no injuries anywhere on Ethan's head or body. Ethan's school principal testified that no incident reports were on file indicating that Ethan had fallen on the school playground. Other school officials testified that Ethan

4

told them he was afraid to go home because Mann would get mad, yell at him, hit and choke him, and "make him run." Ethan had explained to them that Mann's rage stemmed from Ethan's inability to do his homework on his own.

The State also presented the testimony of four of Ethan's treating physicians, including a pediatric intensive care unit physician, a pediatric neurosurgeon, and a child-abuse pediatrician. These physicians all testified that Ethan's brain injury was not consistent with a fall from either a playset or a bed and that his injuries were more consistent with, in the words of one physician, "something that would allow more high energy, such as car accidents or some severe trauma." The physicians also agreed that Ethan's injuries would have been inflicted within hours, not days, of the onset of his symptoms. As to the penile bruising, the child-abuse pediatrician testified that, because the bruising circled the entire base of the penis, it resulted from the penis being squeezed; the medical examiner's testimony echoed this conclusion. Both the child-abuse pediatrician and the medical examiner testified that the

bruising on Ethan's buttocks was clearly a hand-slap mark. The medical examiner testified that Ethan's cause of death was blunt-force head trauma.

1. Mann asserts that the evidence presented against him at trial was insufficient to support his convictions.[2] He also claims that the trial court erred by denying his motion for directed verdict. We apply the same standard of review to both claims: "whether the evidence presented at trial, when viewed in the light most favorable to the verdicts, was sufficient to authorize a rational jury to find the appellant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Virger v. State*, 305 Ga. 281, 286 (2) (824 SE2d 346) (2019). See also *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). The evidence recounted above, including Mann's inculpatory statements in which he admitted to causing

---

[2] Mann also challenges the sufficiency of the evidence for felony murder predicated on aggravated battery — family violence (Count 2), felony murder predicated on cruelty to children in the first degree (Count 3), aggravated battery — family violence (rendering Ethan's brain useless by throwing his body to the ground) (Count 4), and cruelty to children in the first degree (throwing Ethan to the ground) (Count 5). However, Mann was not sentenced on any of these counts, and, accordingly, these claims are moot. See, e.g., *Mills v. State*, 287 Ga. 828, 830 (2) (700 SE2d 544) (2010).

Ethan's injuries, to squeezing Ethan between the legs, and to hitting Ethan on his back and buttocks, was clearly sufficient to support Mann's convictions. Therefore, the trial court did not err in denying Mann's motion for a directed verdict

2. Mann contends that the trial court committed reversible error in five respects. We address each in turn.

(a) Mann first argues that the trial court erred by refusing to give his requested charge on the affirmative defense of accident because, he says, he indicated during his interrogation that he intended to throw Ethan on the bed rather than on the ground. According to Mann, that statement constitutes the slight evidence necessary to authorize a jury instruction on accident. See *Wainwright v. State*, 305 Ga. 63, 70 (5) (823 SE2d 749) (2019) ("[T]o authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge." (citation and punctuation omitted)). As an initial matter, "[c]laims by a defendant that he 'didn't mean to do it' and 'it was an accident' are insufficient without more to authorize a charge on accident." (Citation and

7

punctuation omitted.) *Mills v. State*, 287 Ga. 828, 832 (4) (700 SE2d 544) (2010). However, "[e]ven if the evidence presented authorized the requested charge, the failure to give a requested charge which is authorized by the evidence can be harmless error. The inquiry is whether it is highly probable that the error contributed to the verdict." (Citation and punctuation omitted.) *Reddick v. State*, 301 Ga. 90, 92 (1) (799 SE2d 754) (2017).

The evidence demonstrated that Ethan suffered devastating injuries, including bruising to his genitals, bruising to his body, retinal hemorrhaging in both eyes, bleeding and swelling in the brain, and ultimately brain death as a result of Mann's intentional acts of beating, squeezing, and throwing Ethan. Given this evidence, the jury likely would have discounted any reliance on accident. Indeed, the evidence overwhelmingly supports the jury's finding that Mann acted with malice, which is inconsistent with the defense of accident and his claim that he acted without criminal intent. See *Thomas v. State*, 297 Ga. 750, 753 (2) (778 SE2d 168) (2015). Accordingly, any error by the trial court in failing to instruct

8

the jury on the law of accident was harmless.

(b) Mann also asserts that the trial court erred by denying his requested jury charge on involuntary manslaughter as a lesser included offense of both malice murder and felony murder. Georgia law provides that "[a] person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act *other than a felony*." (Emphasis supplied.) OCGA § 16-5-3 (a).

Mann asserts that, because he told investigators that he did not intend for Ethan to hit the floor, his act of throwing Ethan could constitute either simple battery, see OCGA § 16-5-23 (a) (2), or reckless conduct, see OCGA § 16-5-60 (b), both misdemeanors. Mann again contends that this statement was sufficient to require the trial court to give his requested jury charge on involuntary manslaughter. See *Wainwright*, supra.

Again, assuming for the sake of argument that the trial court erred, we conclude that any error was harmless. Because the State

9

played the admitted portions of Mann's custodial statements for the jury, the jury was aware of Mann's claims that he intended only to throw Ethan on the bed and that Ethan's injuries were inflicted unintentionally. However, Mann's admissions reflect that he threw Ethan in the course of an angry encounter, that he beat the child, and that he squeezed Ethan's penis. The jury also heard testimony from multiple medical experts that Ethan's injuries could only have been inflicted by "significant tremendous forces that were applied to [his] head" and were consistent with Ethan's being picked up and slammed to the ground. There was extensive evidence before the jury that Ethan's injuries were inflicted intentionally and that his death was intentional. Indeed, the jury found as much because it returned a verdict of guilty on the charge of malice murder. See *Bonman v. State*, 298 Ga. 839, 840-841 (2) (785 SE2d 288) (2016) (holding that trial court's refusal to charge involuntary manslaughter as a lesser included offense was harmless error where the jury, by finding appellant guilty of malice murder, necessarily found that he intended to kill the victim). Accordingly, it is highly

10

probable that any error in refusing Mann's requested charge on involuntary manslaughter did not contribute to the jury's verdict. See *Rogers v. State*, 289 Ga. 675, 677-678 (2) (715 SE2d 68) (2011) ("[T]he jury, by also finding appellant guilty of malice murder, made an additional, specific finding that [a]ppellant intended the victim's killing. In light of these circumstances, it is highly probable that the trial court's refusal to give a charge on involuntary manslaughter did not contribute to the verdict." (punctuation omitted) (quoting *Rhode v. State*, 274 Ga. 377, 382 (10) (c) (552 SE2d 855) (2001))).

(c) Mann also contends that the trial court erred when it did not suppress incriminating custodial statements that he made to law enforcement. Specifically, Mann contends that his statements were involuntary and inadmissible under OCGA § 24-8-824 because they were induced by a "hope of benefit."

Under Georgia law, a confession is admissible where it was "made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824. "This Court has consistently interpreted the phrase 'slightest

hope of benefit' not in the colloquial sense, but as it is understood in the context within the statute, focusing on promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." (Citation and punctuation omitted.) *Price v. State*, 305 Ga. 608, 610 (2) (825 SE2d 178) (2019). The trial court concluded that the video-recorded statements were voluntarily made and, thus, were admissible; we review that decision de novo. See *Benton v. State*, 302 Ga. 570, 572 (2) (807 SE2d 450) (2017) (recognizing that "where controlling facts are not in dispute, such as those facts discernible from a videotape, our review [of a trial court's decision on a motion to suppress evidence of a defendant's custodial statement to investigators] is de novo" (citation and punctuation)).

Mann was interviewed on September 20, 2012, beginning at 2:56 p.m., by Investigator Sharon Stewart and Lieutenant Tyrone Oliver. Before beginning the interview, Investigator Stewart read Mann the *Miranda*[3] warnings; Mann thereafter signed a "*Miranda*

---

[3] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

12

Rights - Waiver Form" and agreed to speak with the investigators. After approximately 20 minutes, Mann invoked his right to counsel; Investigator Stewart and Lieutenant Oliver told Mann that Ethan had woken up and had told investigators that Mann was responsible for his injuries. The interview concluded, and Mann was taken to be booked.

Approximately 40 minutes after the first interview ended, Mann reinitiated contact with Investigator Stewart and Lieutenant Oliver via an inmate request form. Mann was returned to the interview room, and Investigator Stewart again advised Mann of his *Miranda* rights. Mann signed a second waiver form and again expressed his desire to speak with the investigators. After being asked by the investigators to "walk [them] through . . . what happened," Mann made his inculpatory statements but maintained that Ethan's injuries were unintentional: he confessed that he "whooped" Ethan and then "threw him on the ground" but claimed that his "intentions was [sic] to throw [Ethan] on the bed." Later in the interview, Mann asked the investigators whether they had lied

13

to him during the first interview when they told him Ethan had woken up. Both Investigator Stewart and Lieutenant Oliver denied lying to Mann but refused to give him any further information about Ethan's state.

On appeal, Mann argues only that the investigator's representations about Ethan's medical condition and availability to give a statement to law enforcement amounted to a hope of benefit, in that Mann believed, based on those representations, that he would not be charged with murder. To support his position, Mann relies solely upon this Court's decision in *State v. Ritter*, 268 Ga. 108 (1) (485 SE2d 492) (1997). In *Ritter*, the interrogating officer told the defendant that the victim would "be okay" except for "a bad headache." Id. at 109 (punctuation omitted). The investigator failed to inform the defendant that the victim had, in fact, died and that the interrogating officer had obtained a warrant for the defendant's arrest on charges of murder and armed robbery. And perhaps most importantly, we concluded that the investigator's "representation regarding the victim's state of health constituted an implied promise

14

that Ritter could not be charged with murder if he gave a statement to the police, but could only be charged with aggravated assault." Id. at 110 (1).

The facts of Mann's case, however, are distinguishable from those in *Ritter*.[4] Here, though the interrogating officers falsely told Mann that Ethan had woken up and told them that Mann caused his injuries, the statement that Ethan was still alive was truthful; indeed, Ethan was not declared dead until the day after Mann's confession, and investigators did not obtain a warrant for Mann's arrest on charges of murder until September 24. "It is well established that artifice and deception do not render a statement involuntary so long as they are not calculated to procure an untrue statement." *Drake v. State*, 296 Ga. 286, 290-291 (3) (766 SE2d 447) (2014) (no hope of benefit when officers represented to the defendant that the deceased victim had survived the shooting). Throughout the interview, the officers exhorted Mann to be honest with them

---

[4] We have serious doubts as to whether *Ritter* was rightly decided; however, because there are sufficient distinctions between *Ritter* and this case, we are not concerned that *Ritter* controls here.

15

and to tell them the truth about what happened on the morning Ethan sustained his injuries. See *Reed v. State*, 307 Ga. \_\_\_, \_\_\_ (2) (a) (\_\_\_ SE2d \_\_\_) (2019) ("[E]xhortations or encouragement to tell the truth and comments conveying the seriousness of a suspect's situation do not render his subsequent statements involuntary.").

Additionally, unlike the defendant in *Ritter*, Mann seemed to place little, if any, reliance on the statements regarding Ethan's health and simply wanted to explain that Ethan's death was an accident. Mann continued to express his disbelief of their earlier statements regarding Ethan's improvement and asked the investigators numerous times whether they were being truthful with him. He also stated that he did not "want [Ethan] laying [in the hospital] about to die" and that he had administered CPR on Ethan to "try to save his life," indicating that he was aware of the severity of Ethan's injuries, regardless of what the investigators told him. Accordingly, there is no merit to Mann's contention that his second statement was involuntary as being induced by a hope of benefit.

(d) Mann contends that the trial court erred by denying his

16

motion for a continuance. Again, his claim is without merit.

In June 2014, Mann retained new trial counsel and was granted a continuance to afford his new counsel time to prepare for trial. Mann filed a second motion to continue in September 2014. The trial court held a hearing on this motion on September 24, 2014, during which trial counsel argued that he required another continuance to secure an expert to rebut the testimony of the State's medical witnesses in support of Mann's accident defense. Trial counsel also noted that he, counsel, had been retained in June 2014 and had only recently obtained Mann's file from prior counsel. The trial court indicated that, because the trial would not start for several days and because the State would not rest for several days longer, Mann had time to secure a witness. The State indicated that, so long as it had the expert's opinion 24 hours before the expert would testify, it would not object to the expert's testifying. The trial did not begin until September 29, and the State did not rest until October 2.

"In considering a motion for continuance, the trial court enjoys

broad discretion and may grant or refuse the motion as the ends of justice may require." (Punctuation omitted.) *Phoenix v. State*, 304 Ga. 785, 788 (2) (822 SE2d 195) (2018) (quoting OCGA § 17-8-22). To obtain a new trial based upon the denial of a motion for a continuance, an appellant must show not only a clear abuse of discretion on the part of the trial court in denying the motion but also that he was harmed by that denial. Id. Mann has not met this burden.

Our review of the record shows that the trial court considered several factors before denying Mann's motion: that it had granted Mann's prior motion for a continuance, that Mann's counsel had not previously apprised the trial court of any difficulties he encountered while preparing for trial, and that one of the State's witnesses rescheduled surgery in order to be available for the September trial date. Given these facts, we cannot say that the trial court abused its discretion in denying Mann's motion for continuance. See *Phoenix*, 304 Ga. at 788 (2). See also *Terrell v. State*, 304 Ga. 183, 185-186 (2) (815 SE2d 66) (2018) ("[T]rial judges necessarily require a great

deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same time, and this burden counsels against continuances except for compelling reasons." (citation and punctuation omitted)).

(e) In his final claim of trial court error, Mann challenges the admission of post-autopsy photographs. The photographs at issue depict a vertical incision extending the length of Ethan's chest, which was made to harvest Ethan's organs for donation. Relying only upon our decisions in *Brown v. State*, 250 Ga. 862 (302 SE2d 347) (1983), and *McClure v. State*, 278 Ga. 411 (603 SE2d 224) (2004), Mann claims that the "gruesome" photographs were "prejudicial and inflammatory."

As an initial matter, we note that, although Mann objected to *some* of the photographs he now challenges, he did not object to all of them, and the basis on which he challenged the photographs at trial is not the same basis on which he now challenges the

photographs on appeal.[5] We therefore review his appellate claim for plain error only. See *Thompson v. State*, 304 Ga. 146, 151 (6) (816 SE2d 646) (2018). See also OCGA § 24-1-103 (d). To establish plain error,

> [Mann] must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings. To show that the error affected his substantial rights, [Mann] is required to show that error probably affected the outcome of his trial.

(Citations and punctuation omitted.) *Bozzie v. State*, 302 Ga. 704, 707 (2) (808 SE2d 671) (2017). See also *State v. Kelly*, 290 Ga 29 (718 SE2d 232) (2011).

In *Brown*, this Court held that "[a] photograph which depicts the victim after autopsy incisions are made or after the state of the body is changed by authorities or the pathologist will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy." 250 Ga. at 867 (5).

---

[5] At trial, counsel argued that the photographs were inadmissible under OCGA §§ 24-4-401, 24-4-402, and 24-4-403.

We applied this rule in later cases, including *McClure*. However, because Mann's trial occurred in 2014, it was governed by the new Evidence Code. As we recently explained, "the rule in *Brown* is no doubt abrogated by the new Evidence Code." (Citation and punctuation omitted.) *Venturino v. State*, 306 Ga. 391, 396 (2) (b) (830 SE2d 110) (2019). We have "disavow[ed] the application of the rule announced in *Brown*, and applied in its progeny, in cases governed by the new Evidence Code." Id. As such, Mann's claim of error predicated on *Brown* and its progeny is meritless.[6]

3. Finally, Mann argues that his trial counsel rendered constitutionally ineffective assistance in two regards. To succeed on these claims, Mann must demonstrate both that his trial counsel performed deficiently and that, absent that deficient performance, a reasonable probability exists that the outcome at trial would have been different. *Strickland v. Washington*, 466 U. S. 668, 687, 694

---

[6] We remind counsel that "Georgia lawyers do this Court no favors . . . when they fail to recognize that we are all living in a new evidence world and are required to analyze and apply the new law." *Davis v. State*, 299 Ga. 180, 192 (3) (787 SE2d 221) (2016).

21

(104 SCt 2052, 80 LE2d 674) (1984). If a defendant fails to satisfy one part of the *Strickland* test, then this Court is not required to consider the other. See *Stripling v. State*, 304 Ga. 131, 138 (3) (b) (816 SE2d 663) (2018). Mann has not met this standard in regard to either of his claims.

(a) Mann first argues that trial counsel rendered ineffective assistance by failing to pursue solely an accident defense. Mann argues that trial counsel confused the jury by presenting multiple theories, through cross-examination and argument, that someone else had caused Ethan's injuries or, alternatively, that the injuries had developed over time.

"An attorney's decision about which defense to present is a question of trial strategy," and trial strategy, if reasonable, does not constitute ineffective assistance of counsel. (Citation and punctuationomitted.) *Bryant v. State*, 306 Ga. 687, 697 (2) (c) (832 SE2d 826) (2019). "A defendant who contends a strategic decision constitutes deficient performance must show that no competent attorney, under similar circumstances, would have made it."

(Citation and punctuation omitted.) *Davis v. State*, 306 Ga. 140, 148 (3) (g) (829 SE2d 321) (2019).

At the hearing on Mann's motion for new trial, trial counsel testified that, before trial, he had prepared two separate defenses for trial. The first was to be used if the trial court suppressed Mann's inculpatory statements and involved multiple theories of defense, including accident, alternative perpetrator, and slow-developing injury; the other, which focused on the sole defense of accident, would be used if the trial court admitted the statements. Counsel explained that he focused on the accident defense until the trial court, at the mid-trial charge conference, declined to give Mann's requested charge on accident; thereafter, trial counsel chose to cross-examine witnesses regarding an alternative perpetrator and a slow-developing injury and to argue the same theories in closing because he wanted to offer "other avenues where a jury could find [Mann] not guilty."

Mann has not articulated how this strategy fell outside the wide range of reasonable professional conduct or, much less, shown

that no competent attorney under similar circumstances would have pursued the same strategy. See *Walker v. State*, 294 Ga. 752, 757 (2) (e) (755 SE2d 790) (2014) ("The fact that present counsel would pursue a different strategy does not render trial counsel's strategy unreasonable." (citation and punctuation omitted)). Given the facts of this case, we conclude that trial counsel's strategy was reasonable — and, thus, that trial counsel did not perform deficiently — and that Mann is not entitled to relief on this claim.

(b) Mann also argues that trial counsel was ineffective by failing to request a jury charge on the voluntariness of his custodial statement. Assuming that this failure constitutes deficient performance, Mann's claim nevertheless fails because he cannot demonstrate prejudice.

As discussed above, ample evidence was before the jury that Mann's second statement was made freely and voluntarily. After invoking his right to counsel during the first interview, Mann reinitiated contact with the investigating officers by signing an inmate request form, and he affirmed his desire to speak with the

24

officers before the second interview. Both Investigator Stewart and Lieutenant Oliver testified that the *Miranda* warnings were read to Mann before the start of each interview and that Mann acknowledged both verbally and in writing that he understood those warnings. Mann offered no rebuttal evidence, and the jury could readily conclude that the officers were not seeking to obtain an untrue statement. Given these circumstances, there is no reasonable probability that the outcome at trial would have been different absent trial counsel's presumed deficiency.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 27, 2020.
Murder. Newton Superior Court. Before Judge Johnson.
*Mark H. Yun, Anthony S. Carter*, for appellant.

*Layla H. Zon, District Attorney, Candice L. Branche, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.