318 Ga. 835
FINAL COPY

S24A0036. SCHMITT v. THE STATE.

PETERSON, Presiding Justice.

Bryan Keith Schmitt challenges his malice murder conviction for the death of Hamid Jahangard, who died after being hit by Schmitt's car.[1] On appeal, Schmitt argues that the trial court committed reversible error by denying his request to instruct the jury on the defense of accident as to all counts. We conclude that the trial court erred because at least slight evidence supported that charge. Because the State has not carried its burden to show that it is highly probable that this error did not contribute to the verdict,

---

[1] The collision in question occurred on July 30, 2019. A Fulton County grand jury indicted Schmitt on August 23, 2019, and reindicted him on October 8, 2021, charging him with malice murder (Count 1), two counts of felony murder (Counts 2-3), and two counts of aggravated assault (Counts 4-5). At trial in September 2022, the jury found Schmitt guilty of all five counts. The trial court sentenced Schmitt to serve life in prison with the possibility of parole for malice murder and merged the aggravated assault counts with the malice murder count, and the felony murder counts were vacated by operation of law. Schmitt timely moved for a new trial. On May 17, 2023, the trial court entered an order denying that motion. Schmitt filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2023 and orally argued on January 9, 2024.

we reverse Schmitt's conviction. And because the trial court also erred in declining the accident instruction as to the related counts of felony murder and aggravated assault, the verdicts on those counts cannot stand. But the evidence was legally sufficient to sustain Schmitt's conviction, and so the State may retry him.[2]

The evidence at trial, including video recordings played for the jury, showed the following.[3] On July 30, 2019, Schmitt was driving his regular commute home from work through a residential area when he saw Jahangard standing by the road. Jahangard made a bouncing or throwing motion with his arm. Schmitt heard a "very loud noise" and felt something slam into the front of his car, "hit [his]

---

[2] Schmitt also asserts that the trial court abused its discretion by denying his motion to exclude State expert testimony that the evidence was inconsistent with an accidental motor vehicle collision, erred by denying his request to charge either of the lesser offenses of "unlawful act" and "unlawful manner" involuntary manslaughter, and erred by overruling his motion under *Napue v. Illinois*, 360 U.S. 264 (79 SCt 1173, 3 LE2d 1217) (1959). Because we reverse and these alleged errors are unlikely to occur again if the State retries him, we do not address them. See *Heard v. State*, 309 Ga. 76, 83 (2) n.10 (884 SE2d 791) (2020).

[3] Because this case calls us to consider whether the trial court's error was harmless, we recount the evidence reasonably and in detail and weigh the evidence as we would expect reasonable jurors to have done, as opposed to viewing it solely in the light most favorable to the jury's verdicts. See *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022).

brakes," continued driving, turned around, and returned to where he saw Jahangard standing near trashcans in a driveway. Schmitt stopped his car in the right lane, with a lane separating him from Jahangard on the left, and rolled his window down. They argued across traffic as cars passed Schmitt's stopped car.

The nature of the argument is unclear. At trial, Schmitt testified that he was leery about pulling into the driveway immediately, as he "didn't know who this was or what the situation might have been." He testified that he asked whether Jahangard "thr[e]w a golf ball or what happened[,]" and Jahangard yelled in response — in a dismissive and loud voice — for him to "get the f**k out of here." In contrast, Jahangard's brother, Manoucher Jahangard, testified that he and Jahangard were talking on the phone[4] when someone talking in a "very loud and fast and angry" manner[5] interrupted their conversation. Manoucher heard

---

[4] Manoucher testified that his phone showed that he or Jahangard initiated the call at 5:37 p.m. The State played for the jury a time-stamped video of the collision that appears to show Jahangard on the phone at this time.

[5] On cross-examination, Schmitt's counsel attempted to elicit

3

Jahangard sound "very surprised" and repeat three times, "I didn't throw anything to you, sir[,]" but the yelling continued. After Jahangard repeated for the third time, "I didn't throw anything to you, sir[,]" Manoucher heard "a bunch of noise" and Jahangard say "[g]et away from my face," but then the phone disconnected.[6]

During this argument, Schmitt decided to turn left into the driveway and accelerated his car to between 15 and 16 miles per hour. During that turn, Schmitt's brake light came on at least once,[7] and he began to veer his car away from Jahangard to the right. Schmitt's car struck Jahangard.[8]

---

Manoucher's agreement that the words "angry" and "aggressive" did not appear in the transcript of his initial interview, and he ultimately responded, "[m]aybe not."

[6] Manoucher testified that, at the time, Jahangard was waiting in the driveway to direct painters to his rental property. Manoucher was "very worried because of the conversation," so he left immediately to check on Jahangard.

[7] Despite using the same video surveillance footage, the State's expert and Schmitt's expert disputed the exact moment that Schmitt hit his brakes. This video surveillance footage was played several times for the jury. Schmitt also testified that he hit the brakes before colliding with Jahangard.

[8] Hours later, after Jahangard's family realized that Jahangard's cell phone was missing, Jahangard's phone was tracked to Schmitt's home address. An officer found the phone, after having someone call it, stuck under the windshield wiper of Schmitt's car with a "completely shattered" front screen.

Jahangard immediately fell to the driveway, hit his head, and began bleeding. Schmitt put his car in park and, without turning it off, exited to render aid. Schmitt kneeled next to Jahangard and stabilized his head while awaiting paramedics. Jahangard died days later, and the autopsy revealed the cause of death as "blunt force injuries of the head due to a motor vehicle collision, car versus pedestrian."

At trial, Schmitt testified in his own defense, denied using the car as a weapon, and denied intentionally striking Jahangard. Schmitt testified that he turned into the driveway "to try to sort out what happened and to see if there was any damage to [his] car." He knew that he was too far up the road to turn left, and he thought he could make a U-turn to turn right into the driveway without impacting Jahangard, but he misjudged the turning radius of his car.[9] As he turned, Schmitt checked oncoming traffic, his rearview mirror, and his side mirror, losing his focus on Jahangard. When he

---

[9] During cross-examination, the State elicited that at the time of the collision Schmitt had been driving for about 30 years and had driven the car that hit Jahangard for six years.

realized the trashcans were directly in front of him, he instinctively cut his wheel to the right and hit the brakes to miss them. Schmitt testified that, upon hitting Jahangard, his military medical training took over and he immediately began to render aid.[10] Throughout his testimony, he referred to the collision as an accident, and he insisted that he did not intend to harm, hurt, scare, intimidate, or kill Jahangard. He testified that he "was trying to avoid an accident" and "was trying to de-escalate the situation."

Both parties' experts acknowledged that the steering wheel was turned to the right before the collision, which kept the center of the car from striking Jahangard,[11] Schmitt's expert specifically testified that the front left corner of Schmitt's car struck Jahangard, and the State's expert conceded that only a few inches — "the very left edge" — of the car struck Jahangard. The experts also opined that once Schmitt began his turn, a collision was inevitable. The

---

[10] Schmitt testified that medical training was a "critical part of military training" and was included as "part of the regular training" that he received during his years serving in the military.

[11] The State's expert also testified that if the wheel had been turned more to the right, Schmitt may have altogether avoided contact with Jahangard.

State's expert opined that a black stain on Jahangard's pants, which were in evidence, was caused by a tire transfer, meaning that the car's front tire rolled over Jahangard's left foot and ankle, and that the car's rear tire rolled over his knee. Schmitt's expert opined that the car did not run over Jahangard's leg, as the GBI investigative report did not reveal automotive paint, plastic, or grease on Jahangard's clothes and based on the expert's review of a video of the collision.

Several witnesses also testified at trial. Donald Utroska, Jr., testified that he was driving when "all of a sudden" he saw "garbage cans and a car" move "swiftly" into the driveway. The car moved into the driveway "awfully fast" and sent "very tall garbage cans in the air a good three to four feet." Utroska pulled over when he saw Jahangard on the driveway with pooling blood, and Schmitt asked him to call 911. He also testified that Schmitt explained that Jahangard threw a golf ball at his car, Schmitt and Jahangard argued, and when Schmitt pulled over to discuss it, Jahangard jumped in front of his car. After paramedics arrived, Utroska offered

7

his contact information to Schmitt and found it "a little strange" that Schmitt declined. Utroska described Schmitt's demeanor as "very emotionless, very plain[,]" and "nonchalant."

Jessica Woodson testified that she lived across the street from where the collision occurred and her security camera recorded the collision. Though she did not see the collision, she saw out of her window two men standing and one man lying on the driveway across the street. She described the man in the driveway as "laid out," unmoving, with his eyes open, with blood coming from his head, and with his left leg hyperextended at the knee. When she arrived, the car was still running and Schmitt was attempting to render aid to Jahangard. She reprimanded Schmitt for attempting to move Jahangard's leg, which was under the back bumper and behind the driver's side back wheel. Woodson testified that, when asked what happened, Schmitt told her that Jahangard was walking, yelled something, and threw something at his car. When Schmitt turned in the driveway to see what happened, Jahangard pushed a trashcan onto his car, and the trashcan bounced off of Schmitt's car and

knocked Jahangard over. Woodson described Schmitt's demeanor as "a little defensive" and as not giving the impression that he was concerned about Jahangard.

Mokraine Lhocine testified that he was driving a company van that contained a dashcam that recorded the collision. Lhocine saw a stopped car in the middle of the road with cars passing it, then the car made a "quick" turn and hit trashcans. As Lhocine continued down the road, he saw that the door of the car was open, the driver was holding somebody on the ground, and "there was a lot of blood around him."

Captain Jeremiah Green of the Sandy Springs Fire Department testified that, when he arrived, Schmitt was kneeling beside Jahangard and focused on holding Jahangard's neck in a way that protected the spine from further injury. Schmitt told Captain Green that he did not know what happened or remember if Jahangard was hit. Schmitt "mentioned something about a golf ball, and he mentioned that the patient was yelling at him."

James Durden, a paramedic, testified that when he arrived

Jahangard was unconscious but breathing spontaneously, lying on his back with a significant amount of blood coming from the back of his head and ears, with possible hyperextension to his left leg. Schmitt did not remember whether Jahangard "went up and over or underneath" the car, and Durden was "a little struck that there wasn't more emotion or concern[.]"

Police arrived around 40 minutes after the collision, and it had started raining.[12] By that point, firefighters had moved the trashcans, Schmitt had been permitted to move his vehicle, the rain washed "[n]inety-nine percent of the blood away[,]" and a moving van had driven through the driveway. Police officers nevertheless photographed the scene, a golf ball found in a neighbor's yard, and Schmitt's car. Police permitted Schmitt to drive the car home. The lead detective testified that when police ultimately seized Schmitt's vehicle pursuant to a warrant several days later, there was no fiber,

---

[12] Schmitt's counsel elicited law enforcement testimony that, despite this delay, Schmitt remained voluntarily on the scene for an additional 30 to 40 minutes after police arrived while he was interviewed by police twice and wrote a statement, before being dismissed by police.

10

hair, clothes, or anything of evidentiary value found.

Two video recordings of the collision were played for the jury: Woodson's security video and the company van's dashcam video. The State also played body camera footage from the police officer who responded to the scene. As captured in that recording, Schmitt described that Jahangard pushed a trashcan in front of his car as he began to make a U-turn, Schmitt swerved to miss it, and the trashcan hit the corner of his car and bumped Jahangard, who lost his footing and fell. The State also presented Schmitt's written statement, which consisted of a similar narrative.

1. Schmitt argues that the trial court erred in denying his request to instruct the jury on accident as a defense to malice murder and that this error was not harmless. We agree.

Schmitt timely requested a jury instruction on the defense of accident and contended that the evidence supported that charge. Although the trial court indicated initially that it was proper to instruct the jury on the defense of accident, it changed its position several times and ultimately rejected this instruction as to all

11

counts.[13]

Hours after the charge conference, in his closing argument, Schmitt presented a slide labeled "KEY LEGAL PRINCIPLES" that stated, "ACCIDENT[:] IF THIS WAS AN ACCIDENT, AND THERE WAS NO CRIMINAL INTENT, THIS WAS NOT A CRIME." The State objected "based on the slide and that this is a legal principle." The State continued, "This is not a principle applicable to this case and not a charge of the Court." The court sent the jury out to discuss with the parties. The trial court directed Schmitt that, although the court rejected the accident charge, Schmitt could "argue that it was unintentional" — in other words, Schmitt could argue that he lacked the necessary intent. The trial court eventually brought back the jury, sustained the State's objection, and instructed the jury

> to disregard the statement offered by the defense counsel; in particular, that "accident" is a key legal principle that

---

[13] The trial court opined, "[t]his is all going to turn on whether or not accident refers to . . . whether or not the movement of the car is intentional or not, notwithstanding the result of what happened and a suggestion that the evidence — some parts of the evidence are that the result was unintended, but the turn and the movement of the vehicle clearly was intended, and so I think it comes down to that." The trial court distinguished between the "use of accident as we use it as human beings" and the legal definition of accident.

12

is a part of this case because it is not. It was therefore improper for defense counsel to display a slide designated Key Legal Principles with the word "accident" below it.

Schmitt continued his closing argument and insisted that "[t]his was an accident" and that, "[i]f this was an accident, if there was no criminal intent, then it's not a crime." The trial court instructed the jury on the presumption of innocence, the burden of proof, the definition of intent, the definition of malice, and that malice could be express, implied, or both. During deliberations, the jury requested a copy of Black's Law Dictionary "for [a] definition of abandoned and malignant heart[,]" to view the PowerPoint presentations used by the parties in closing argument, and a transcript of closing arguments. The trial court denied each of these requests and instructed the jury to rely on the law as charged.

(a) The trial court erred in failing to instruct the jury on accident as a defense to malice murder.

"[The] accident defense applies where the evidence negates the defendant's criminal intent, whatever that intent element is for the crime at issue." *State v. Ogilvie*, 292 Ga. 6, 9 (2) (b) (734 SE2d 50)

13

(2012). In the context of malice murder, that means that an accident defense is available when there is evidence that the defendant caused another's death but acted without an express or implied intent to commit an unlawful homicide. See id. at 10 (2) (c); OCGA § 16-5-1; *Taylor v. State*, 303 Ga. 624, 626 (1) (814 SE2d 353) (2018) (defining intent requirement for malice murder).

"[T]o authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge[.]" *Wainwright v. State*, 305 Ga. 63, 70 (5) (823 SE2d 749) (2019) (citation and punctuation omitted). The State contends that slight evidence did not support the accident instruction because, in the context of the affirmative defense of accident, this Court has held that a defendant's conclusory claims that the defendant "didn't mean to do it" or that a particular act "was an accident" "are insufficient without more to authorize a charge on accident." *Mann v. State*, 307 Ga. 696, 699 (2) (a) (838 SE2d 305) (2020) (citation and punctuation omitted) (holding that any error in failing to give requested accident instruction was harmless, although defendant indicated he intended

14

to throw the seven-year-old victim on a bed rather than on the ground, because evidence — including that the victim's "devastating injuries, including bruising to his genitals, bruising to his body, retinal hemorrhaging in both eyes, bleeding and swelling in the brain, and ultimately brain death" resulted from the defendant's "intentional acts of beating, squeezing, and throwing" the victim — overwhelmingly supported the jury's finding that the defendant acted with malice); see also *Mills v. State*, 287 Ga. 828, 832 (4) (700 SE2d 544) (2010) (holding the misuse of a firearm described by the defendant showed a degree of culpability which constituted criminal negligence such that the trial court did not err in refusing the accident instruction); *McDade v. State*, 270 Ga. 654, 657 (5) (513 SE2d 733) (1999) (holding that the trial court properly rejected request for accident instruction when defendant's statements and versions of events either could not have resulted in victim's fatal gunshot wound or did not show the absence of a criminal scheme, undertaking, intention, or criminal negligence), disapproved of on other grounds by *Clark v. State*, 315 Ga. 423, 435 (3) (b) n.16 (883

15

SE2d 317) (2023).

But those decisions do not apply here. In each of those cases, evidence of intentionality was strong and there was no theory of accident that would not have necessarily constituted criminal negligence. See *Browner v. State*, 296 Ga. 138, 144 (4) (765 SE2d 348) (2014) (defining "criminal negligence" as a "reckless and wanton negligence of such a character as to show an utter disregard for the safety of others who might reasonably be expected to be injured thereby" (citation and punctuation omitted)).

In comparison, the evidence supporting Schmitt's theory of accident did not require a finding of criminal negligence. Instead, the undisputed evidence showed that Schmitt turned his car left, accelerated his car to between 15 and 16 miles per hour, veered his car to the right and away from Jahangard, at some point tapped his brakes, and that the left edge of Schmitt's car struck Jahangard. Nothing about this necessarily shows any criminal negligence because Schmitt's theory of accident does not rest on conduct which is itself a criminal act and because a rational juror could find from

the evidence that this was an accident. And so in this context, Schmitt's testimony that the collision was an accident presented at least slight evidence necessary to warrant an instruction on the defense of accident.

The State argues that Schmitt acted with an utter disregard for Jahangard's safety (and thus criminal negligence) when he accelerated into the driveway with knowledge of Jahangard's location. But this is a disputed issue, and there was other evidence that a juror could find showed a lack of such criminal negligence. Schmitt testified that he turned into the driveway "to try to sort out what happened and to see if there was any damage to [his] car." Schmitt denied using the car as a weapon, denied intending to intimidate Jahangard, and denied intentionally striking Jahangard. Rather, Schmitt testified that he misjudged the turning radius of his car, he lost his focus on Jahangard as he checked for traffic as he turned, he turned his car to the right — away from Jahangard — before the collision, and he slammed on his brakes. Moreover, Schmitt and his expert testified that his brake lights came on, went

17

off, and came back on before the collision; witnesses testified that Schmitt rendered immediate aid; video footage corroborated that he rendered immediate aid; both experts testified that Schmitt turned his car to the right, away from Jahangard, before the collision; both experts described that the front left corner of Schmitt's car (rather than the center of the car) hit Jahangard; and Schmitt's expert testified that a GBI investigative report revealed that there was no automotive paint, plastic, or grease on Jahangard's clothes.

Therefore, at least slight evidence supported that "there was no criminal scheme or undertaking, intention, or criminal negligence," and the trial court erred in declining the accident instruction. OCGA § 16-2-2.

(b) The trial court's error was not harmless.

The State has failed to carry its burden to show that this error was harmless. Evidence of Schmitt's criminal intent was conflicting and far from overwhelming, and the harm from the trial court's failure to instruct the jury on the defense of accident was compounded by the trial court's express instruction that the jury

18

must "disregard" that accident was a key legal principle.

As an initial matter, it is well settled that "[t]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Jivens v. State*, 317 Ga. 859, 863 (2) (896 SE2d 516) (2023) (citation and punctuation omitted). For this analysis, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done instead of viewing it in the light most favorable to the jury's verdict." Id.

The parties do not dispute that Schmitt caused Jahangard's death when he turned his car into the driveway and his car collided with Jahangard. Rather, the central question presented to the jury was whether Schmitt acted with criminal intent.[14] And evidence as

---

[14] In his opening statement, Schmitt condensed the crux of his argument:
> The one real dispute in this case, the one question that really matters, the key question that you, the jury, will have to answer when deciding the fate of Mr. Schmitt is this. What was Mr. Schmitt intending to do when he pulled in that driveway and made that turn?

Similarly, in closing argument, the State explained to the jury that "[t]he question is whether or not the defendant's intentional actions, as demonstrated by the evidence that's been introduced here and by his own admissions, were criminal. Were they criminal? That is the dispute at issue. That's it."

to this point was far from overwhelming.

The State contends that evidence of Schmitt's conduct and demeanor before, during, and after the collision presented evidence of his criminal intent — that he intended to kill Jahangard. See *Guzman-Perez v. State*, 310 Ga. 573, 576-577 (1) (853 SE2d 76) (2020) ("[C]riminal intent is a question for the factfinder, and can be inferred from the defendant's conduct before, during, and after the commission of the crimes[.]"). Among other things, the State points to the argument before the collision, which was corroborated with time-stamped video footage showing Jahangard on the phone at this time and the fact that Jahangard's phone was found hours later, "completely shattered," under the car's windshield wiper. The State elicited that Schmitt intended to return to where he saw Jahangard standing, to turn left despite knowing Jahangard's proximity to his car, and to accelerate his car. The State pointed to expert testimony that, once the turn began, the collision was inevitable. The State's expert further opined that the stain on Jahangard's pants must have come from tire transfer, the car's front tire rolled over his knee and

20

ankle, the car's rear tire rolled over his knee, and that evidence of the injuries was inconsistent with an accidental collision. Witnesses described how "awfully fast," "all of a sudden," and "quick" the car turned and sent "very tall garbage cans in the air a good three to four feet." These witnesses were "a little struck that there wasn't more emotion or concern" and described Schmitt's demeanor as "very emotionless, very plain[,]" and "nonchalant[,]" "a little defensive[,]" and seemingly not concerned about Jahangard. These witnesses also testified as to differing accounts Schmitt provided about what happened: (1) Jahangard pushed a trashcan on Schmitt's car, which bounced off and knocked Jahangard over; (2) Schmitt could not remember what happened; or (3) Jahangard jumped in front of his car. The State contended the fact that in each account Schmitt mentioned the argument, mentioned the golf ball, and downplayed Jahangard's injuries further evidenced Schmitt's criminal intent.

On the other hand, Schmitt asserts that evidence from before, during, and after the collision shows an *absence* of criminal intent.

21

Among other things, Schmitt points to his testimony that he intended to de-escalate the situation and talk it over, he misjudged the turning radius of his car, he lost his focus on Jahangard while making the turn, he instinctively cut his wheel to the right and hit the brakes, and he exited the car and, without turning it off, rendered immediate aid. Schmitt corroborated his testimony about rendering aid with witness testimony and video footage. Schmitt also denied using the car as a weapon or to strike Jahangard. Moreover, Schmitt presented expert testimony opining that Schmitt's brake lights came on twice and that Schmitt veered away from Jahangard, thus indicating his efforts to slow down and avoid hitting Jahangard, Schmitt moved between 15 and 16 miles per hour during the turn, and that the car did not run over Jahangard's leg. Further, expert testimony highlighted that the GBI's investigative report did not reveal the presence of automotive paint, plastic, or grease on Jahangard's clothes.

Although there was certainly evidence supporting the State's theory that Schmitt acted with malice, that evidence was disputed

and not overwhelming. This is especially so when undisputed evidence showed that Schmitt turned his car away from Jahangard such that only the edge of his car struck Jahangard, Schmitt immediately rendered aid, and Schmitt did not leave or try to leave until police officers dismissed him. See *Rush v. State*, 294 Ga. 388, 390 (2) (a) (754 SE2d 63) (2014) (evidence of a defendant's attempt to flee or evade arrest can be circumstantial evidence of guilt).

The State contends that any error was harmless because the trial court did not foreclose Schmitt's accident defense and because, in finding Schmitt guilty of malice murder, the jury necessarily rejected this defense. We disagree.

One way that the failure to give an accident instruction can be harmless is if the jury finds the defendant guilty of malice murder after "the trial court properly instructed the jury on the elements of malice murder and the requisite malicious intent[,]" because the jury's conclusion that the defendant acted with malice necessarily means that the jury would have discredited the accident defense. *McClain v. State*, 303 Ga. 6, 9-10 (2) (810 SE2d 77) (2018); see also

23

*Sears v. State*, 290 Ga. 1, 4 (3) (717 SE2d 453) (2011); *Hannah v. State*, 278 Ga. 195, 197 (2) (599 SE2d 177) (2004). But that conclusion does not follow here where, in addition to failing to instruct the jury on the defense of accident, the trial court instructed the jury *to disregard* that accident was a key legal principle — even though Schmitt testified that the collision was an accident, and during Schmitt's closing argument in response to a demonstrative slide defining accident as the lack of criminal intent.[15]

Qualified jurors are presumed to follow jury instructions. See *Robinson v. State*, 308 Ga. 543, 552 (2) (b) (ii) (842 SE2d 54) (2020). Because the trial court instructed the jury to disregard accident as a key legal principle, we assume that the jury followed this instruction and so disregarded accident as a key legal principle in reaching the verdicts.

---

[15] Although the trial court directed that Schmitt could "argue that it was unintentional" such that he lacked the requisite criminal intent, this clarification was outside the presence of the jury. Schmitt explained to the jury that "the principle [was] correct" that "[i]f this was an accident, if there was no criminal intent, then it's not a crime." But by then, the trial court had already instructed the jury to "disregard" that accident was a key legal principle in this case.

Moreover, the trial court's failure to instruct the jury on the defense of accident taken together with the trial court's direction that the jury "disregard" accident as a "key legal principle" meant that the jury was not authorized to find that the collision was an accident. Although Schmitt presented evidence supporting his accident theory and advanced this theory in his opening statements, throughout trial, and in his closing argument, the trial court refused the instruction and so "deprived the jury of the necessary tools to evaluate the charges against [Schmitt] and to reach a verdict[.]" *Henry v. State*, 307 Ga. 140, 146 (2) (c) (834 SE2d 861) (2019) ("[J]ury instructions are the lamp to guide the jury's feet in journeying through the testimony in search of a legal verdict." (citation and punctuation omitted)).

Under these circumstances, we cannot say that it is highly probable that the trial court's error in declining the accident instruction did not contribute to the verdict for malice murder. We therefore reverse Schmitt's conviction as to this count.

2. Schmitt also contends that the trial court erred in declining

25

the accident instruction as to the remaining counts, and that this error was not harmless. We agree and accordingly reverse those counts as well.

Because we reverse the malice murder conviction, the felony murder counts predicated on aggravated assault are no longer vacated as a matter of law. See *Clough v. State*, 298 Ga. 594, 597-598 (2) (783 SE2d 637) (2016) (considering impact of trial court's failure to instruct the jury on voluntary manslaughter as to vacated felony murder counts, after concluding the malice murder conviction was due to be reversed). Thus, we address whether the trial court erred in omitting the accident instruction as to those counts.

The indictment charged Schmitt with a total of five counts. Count 1 charged him with malice murder. Count 2 charged him with felony murder predicated on aggravated assault as alleged in Count 4, which alleged that he committed an assault on Jahangard's person with a motor vehicle by striking him with such vehicle.[16]

---

[16] Count 4 charged that Schmitt "did unlawfully commit an assault upon the person of Hamid Jahangard with a motor vehicle, an object which when

26

Count 3 charged him with felony murder predicated on aggravated assault as alleged in Count 5, which alleged that he committed an assault on Jahangard's person with a motor vehicle and by driving toward Jahangard, thereby placing him in reasonable apprehension of immediately receiving a violent injury.[17]

In contrast to malice murder, "[p]roof of felony murder does not require proving malice or the intent to kill, but only that the defendant had the requisite criminal intent to commit the underlying felony." *Tessmer v. State*, 273 Ga. 220, 222 (2) (539 SE2d 816) (2000) (citation and punctuation omitted); see also OCGA § 16-5-1 (c) ("A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being *irrespective of malice*." (emphasis added)). It follows, then, that although felony murder has no specific mens rea that accident can

_____

used offensively against another is likely to result in serious bodily injury, by striking him with said motor vehicle[.]"

[17] Count 5 charged that Schmitt "did unlawfully commit an assault upon the person of Hamid Jahangard with a motor vehicle, an object which when used offensively against another is likely to result in serious bodily injury, by driving at toward and in the direction of the said Hamid Jahangard, said act placing him in reasonable apprehension of immediately receiving a violent injury[.]"

27

defeat, accident can effectively act as a defense to felony murder when it is a defense to the predicate offense. See *Tessmer*, 273 Ga. at 222-223 (2) (identifying no error in charging the jury that accident was not a defense to felony murder, given that the jury also was charged that accident was a defense to the underlying felony of aggravated assault and that it could not convict for felony murder unless defendant was found guilty of the underlying felony of aggravated assault; noting that "mens rea is a necessary element of aggravated assault"); see also *Scott v. State*, 306 Ga. 417, 422-423 (3) (831 SE2d 813) (2019) (holding trial court did not plainly err in instructing the jury that "the defense of accident did not apply to felony murder based on aggravated assault *if the jury found that the aggravated assault was intentional*" (emphasis added)). And here, the indictment predicated the two felony murder counts on the offense of aggravated assault.

Aggravated assault has two elements: (1) the commission of a simple assault under OCGA § 16-5-20 and (2) the presence of a statutory aggravator. See OCGA § 16-5-21 (a). "[T]he simple assault

28

encompassed within aggravated assault may be committed in two ways: when a person '[a]ttempts to commit a violent injury to the person of another,' OCGA § 16-5-20 (a) (1), or when a person '[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury[,]' [OCGA § 16-5-20] (a) (2)." *Kipp v. State*, 294 Ga. 55, 59 (2) (a) (751 SE2d 83) (2013).

The substance of Count 4 alleged that Schmitt committed a simple assault under OCGA § 16-5-20 (a) (1), and the substance of Count 5 alleged that Schmitt committed a simple assault under OCGA § 16-5-20 (a) (2). In both counts, the statutory aggravator alleged is that Schmitt committed assault "with a motor vehicle, an object which when used offensively against another is likely to result in serious bodily injury[.]" See OCGA § 16-5-21 (a) (2). Against this backdrop, and considering that "[the] accident defense applies where the evidence negates the defendant's criminal intent, whatever that intent element is for the crime at issue," *Ogilvie*, 292 Ga. at 9 (2) (b), we address separately the aggravated assault allegations in Counts 4 and 5.

(a) Aggravated Assault as Alleged in Count 4

The crime of simple assault as set forth in OCGA § 16-5-20 (a) (1) requires "the presence of criminal intent[.]" *Kipp*, 294 Ga. at 59 (2) (a). There must be an "intent to cause harm[,]" which refers "to the requisite mens rea of intent" and also "to a defendant's deliberate purpose to accomplish an injurious result." *State v. Springer*, 297 Ga. 376, 381 (1) (774 SE2d 106) (2015).

Here, as set forth above, more than slight evidence negated that Schmitt acted with the intent to cause harm or with the deliberate purpose of harming Jahangard. Because more than slight evidence negated that Schmitt acted with the requisite criminal intent, the trial court erred in declining the accident instruction as to Counts 2 and 4.

(b) Aggravated Assault as Alleged in Count 5

The crime of simple assault as set forth in OCGA § 16-5-20 (a) (2) requires the State to prove that the defendant *acted with criminal intent* to commit the act which caused the victim to be reasonably apprehensive of receiving a violent injury. See *Patterson*

30

*v. State*, 299 Ga. 491, 493 (789 SE2d 175) (2016) (holding that the State need not prove the defendant driver acted with a specific intent to place the victim in such apprehension when "evidence of [the defendant's] intent to drive the vehicle as he did [was] undisputed"); see also *Stobbart v. State*, 272 Ga. 608, 611 (3) (533 SE2d 379) (2000) ("There *is* an intent of the accused that *must* be shown, but it is only the *criminal intent to commit the acts* which caused the victim to be reasonably apprehensive of receiving a violent injury[.]" (citation and punctuation omitted; emphasis added)).

The State contends, and Schmitt concedes, that *Patterson* precluded the accident instruction as to Counts 3 and 5, because Schmitt intended to do the act which placed Jahangard in reasonable apprehension of immediate violent injury.[18] Both parties

---

[18] In his brief and at oral argument, Schmitt conceded that *Patterson* was binding as to Counts 3 and 5, such that the trial court did not err in declining the accident instruction as to those counts. Instead of arguing that *Patterson* does not preclude the accident defense as to these counts, Schmitt asked that we overrule *Patterson*. But we are not required to accept a party's concession on a matter of law. And because *Patterson* as we explain it today did not

31

appear to interpret *Patterson* to mean that because Schmitt intended to turn his car, an accident instruction was improper as to these counts because the State did not have to prove that Schmitt acted with the specific intent to place Jahangard in reasonable apprehension of immediate violent injury. But that construction omits altogether the requirement that a defendant act *with criminal intent* in committing the act which places another in such apprehension.

In *Patterson*, during an argument in which the victim asked Patterson to leave, "Patterson went to his vehicle, put it into gear, revved the engine, and rapidly drove directly toward the end of the home, near [the victim], who became pinned against the side of the home by the vehicle[.]" 299 Ga. at 491. Patterson's criminal intent in performing these acts was clear: "evidence of Patterson's intent to drive the vehicle *as he did* [was] undisputed." Id. at 493 (emphasis added). Thus, the requirement that Patterson act with criminal

preclude the accident defense as to these counts, we do not reach the question of reconsidering it.

intent as he did the act which placed the victim in such apprehension was satisfied.

In contrast, at least some evidence supports Schmitt's claim that, although he intended to turn his car, he did not intend to turn it in the way that he did, so he did not have criminal intent. Because at least slight evidence created such a question as to whether Schmitt acted with the requisite intent, the trial court erred in declining the accident instruction as to Counts 3 and 5.

Finally, for the same reasons as above, the trial court's error in declining the accident instruction as to Counts 2, 3, 4, and 5 was not harmless, and so we reverse those counts.

*Judgment reversed. All the Justices concur.*

Decided April 30, 2024.

Murder. Fulton Superior Court. Before Judge Leftridge.

*Matthew K. Winchester; Garland Samuel & Loeb, John A. Garland, Donald F. Samuel, Kristen W. Novay*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Mario Kladis, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Elizabeth H. Brock, M. Catherine Norman, Assistant Attorneys General*, for appellee.