NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 20, 2024

S24A0894.  WILLIAMS v. THE STATE.

McMILLIAN, Justice.

In October 2018, a jury found Jasmine Williams guilty of malice murder in connection with the shooting death of Gregory Swinson.[1] On appeal, Williams argues that (1) the trial judge should have recused himself for his conduct during the trial; (2) the trial court erred in failing to charge the jury on justification, accident, and voluntary manslaughter; and (3) her trial counsel rendered

---

[1] Swinson was shot on or about September 16, 2017, and succumbed to his injuries approximately four days later. On November 13, 2017, a Coffee County grand jury indicted Williams for felony murder (Count 1) and malice murder (Count 2). At a jury trial in October 2018, the jury found Williams guilty on both counts. The trial court sentenced Williams to serve life in prison without the possibility of parole on Count 2; Count 1 was vacated by operation of law. Williams timely filed a motion for new trial, which was amended through new counsel on August 31, 2023, and September 18, 2023. Following a hearing, the trial court denied the motion for new trial, as amended, on September 27, 2023. Williams timely appealed, and her case was docketed to the August 2024 term of this Court and submitted for a decision on the briefs.

constitutionally ineffective assistance by withdrawing his request to charge on defense of habitation. For the following reasons, we affirm.

The evidence presented at trial showed that Williams and Swinson began a romantic relationship around April 2017. For a short period of time, Swinson lived with Williams in her home in Coffee County before moving into his own apartment. Williams's roommates, brothers Chad and Dustin Kitchens, continued living in her home. On the evening of September 15, 2017, Williams and Swinson went to Swinson's grandmother's home where they hung out with various relatives for a couple of hours. Around 9:30 p.m., Williams and Swinson went to Williams's grandparents' home, where they drank alcohol, played cards, and watched football until about midnight. Swinson then returned to his grandmother's house and spoke with his grandmother and uncle.

Swinson's uncle testified that when Swinson came inside, he "was crying and screaming at the top of his voice about . . .

[Williams]." Swinson had scratches on his back and his chest and a "busted" lip. Swinson's grandmother testified that he had so many scratches on his body that "[h]e looked like a cat had been over him." Swinson told his uncle that Williams had scratched him and that he had to "g[e]t her off of him" by pushing her. Later, Swinson's grandmother agreed to drive Swinson to Williams's house to pick up a car that Williams and Swinson's grandmother had discussed because, according to Swinson, Williams had told him to come pick up the car. Swinson's grandmother drove him to Williams's house and dropped him off.

Chad testified that at roughly 3:00 a.m., Swinson ran into his bedroom, waking him up, and told him that he wanted him to "be a witness to whatever happens." Chad told Swinson, "[Y]'all don't start this tonight," but Swinson insisted on showing Chad his back, which was covered with scratches. Chad then looked through his bedroom door into the hallway and saw Williams walking toward them, holding a gun in her hand. Swinson said, "[S]he's got a gun."

3

Chad rubbed his eyes, still groggy from just waking up, and heard Williams say, "[W]ell, why don't you get the f**k out, Greg," followed by a gunshot. When he opened his eyes, he saw Swinson fall to the ground in the bedroom and told Williams, who had entered the bedroom, to call 911. As Chad waited for law enforcement officers to arrive, he did not see anything out of place in the house other than Swinson's cell phone on the floor near the back door.

A recording of Williams's 911 call was played at trial. During that call, Williams told the 911 operator, "I shot him in the head. . . . We were together in a relationship, and we broke up, and I got mad, and I didn't realize that I had the trigger pulled, and I hit him in the head with the gun, and it went off, and it shot him in the head." Later, one of the responding law enforcement officers heard Williams talking on her cell phone, via speaker phone, with someone she referred to as "mama" and heard the person on the other line tell Williams: "[unintelligible] it was self-defense . . . he was on you. You tell them he was on you." Swinson was transported to a local

4

hospital, where he died from his injuries several days later.

Officers were able to locate the firearm Williams used to shoot Swinson in a linen closet in the hallway. Williams told one officer that she hit Swinson in the head with the gun and "it went off." She told another officer that she and Swinson were breaking up and that he struck her in the face, so "she grabbed a gun" and "struck him in the head," and "the gun went off." She also told another officer that she had been "arguing over her relationship" with Swinson since 7:30 that evening and that "she went and got her gun and she was going to hit . . . him with it and it went off." Crime scene photographs taken of Williams's living room showed that no furniture or other items appeared to have been knocked over or disturbed.

While at the police department, Williams and her mother requested that officers take photographs of injuries on Williams's body. Williams stated, however, that they were "old injuries . . . from being sexual." The next day, Williams again asked officers to take photographs of new injuries that had emerged – two bruises on her

5

legs and a small injury on her finger.

A firearms examiner with the Georgia Bureau of Investigation testified that she evaluated the gun used by Williams, a Smith & Wesson .357 Magnum revolver, and determined that the firearm worked correctly and that the revolver's two types of safeties were functional, meaning that the weapon "cannot go off accidentally" because the safeties would "physically block it." For the gun to fire, the shooter had to pull the trigger "all the way to the rear back." The medical examiner who performed the autopsy testified that Swinson had a wound on his lower lip and abrasions "in various stages of healing" on his face, neck, chest, back, and both arms. The abrasions were consistent with scratches. The medical examiner concluded that Swinson died from a gunshot wound to his head. Swinson was shot at an intermediate range, at most two or three feet, and did not suffer a "contact gunshot wound" where the "muzzle of the gun is in contact with the skin of the victim." The bullet entered the right side of his head and exited through the front of his scalp.

The State also presented evidence of Williams's prior use of firearms to threaten men she had dated. Samual Holland, Williams's former fiancé, testified that one day around April 2015, he came home from work to find that Williams had cut her own wrists because she was upset that he had come home late. When Holland tried to bandage her wrists, Williams started yelling and hit Holland's leg with a knife. Williams then shouted, "[W]ell, we'll both just die then," and, "I'm going to shoot you . . . you deserve to die." When Holland saw Williams stand up and walk in the direction of a firearm on the kitchen counter, he fled to his vehicle and left.

Cody Willard testified that he and Williams had a brief romantic relationship. After they broke up, Willard remained friends with Williams's roommate Chad. One day in the fall of 2016, Willard and some other friends were parked outside Williams's home talking with Chad. When Willard had to use the restroom, he decided to do so behind the shed in Williams's backyard. While on his way to the shed, he saw Williams sitting outside. Williams told

him he needed to leave. Willard returned to his friend's car and continued speaking with Chad. Williams then came outside with a gun and told Willard he needed to leave now. Willard jokingly responded, "You won't shoot me." Williams, who was "kind of . . . point[ing the gun] at [Willard]," told Willard, "I won't shoot them, but I'll shoot you." Willard and his friends then drove away. Willard testified that the gun Williams used to threaten him appeared to be the same gun that Williams shot Swinson with. Dustin also testified as to this incident and recounted that Williams came into the house that day and told him, "I'm going to kill Cody Willard," and then retrieved a firearm. He then looked outside and saw Williams holding the firearm while she approached the vehicle that Willard was sitting in.

Williams testified in her own defense at trial. According to Williams, she purchased a box of wine on the evening of September 15, and she and Swinson were drinking the wine that evening. They got into an argument in the car on the way home from her

grandparents' house, and she hit Swinson in the face; Swinson then hit her in the face in retaliation. At Swinson's request, Williams drove Swinson to his grandmother's house. When they arrived, Swinson got into a "stance like a boxer" and said, "[W]hy don't you want to fight me now when I can protect myself?" She claimed Swinson swung at her and grabbed her by the waist and pinned her up on the car and that she then scratched him. Williams also stated that Swinson then carried her and slammed her into the door of his grandmother's house. Swinson's uncle opened the door and told them they "needed to take it somewhere else," so Swinson let her go, and she drove home.

When she returned home, Williams called her friend who suggested that Williams put Swinson's things outside so she would not have to interact with Swinson if he came over.[2] When Swinson texted her and told her that he was coming over, she told him they

---

[2] Williams's friend testified at trial and confirmed that this conversation took place.

should "do this tomorrow," but Swinson responded that he was coming over anyway.[3] Williams testified that when Swinson arrived, he banged on her door. She opened the door and stepped outside to tell him that his things were on the porch before going back inside the house. Swinson started banging on the door again, and when she cracked the door open to tell him to leave, he "pushed his way inside the house." Once inside, he "picked [her] up and tossed [her] down on the floor." When she "got back up and . . . tried to push him out some more," Swinson "picked [her] up again and . . . tossed [her] over the couch."

After she got up, Swinson was already in Chad's bedroom, so she went to the linen closet and retrieved her gun from its holster to "scare" Swinson. She went to Chad's bedroom and said, "[G]et the F out." Williams claimed, "The next thing I remember is I raised the gun over my head, upward, and I went to hit him. I swung it down

---

[3] No other evidence of this text message exchange was introduced at trial.

to hit him on the head with it and then I saw him fall down. And I saw him fall down and I thought I had knocked him out, but then I saw the blood and Chad screamed. So I ran and grabbed my phone and I threw the gun into the closet and I called the police." However, Williams also testified that she did not know whether the gun actually hit Swinson when it went off.

1. Williams first asserts that the trial judge should have granted her motion to recuse. The record shows that, on the morning of the third day of trial, Williams filed a motion to recuse the trial judge, which was referred to and heard by a different judge. At an evidentiary hearing conducted that same day, Williams's former employer, local attorney Patrick Ferris, testified that, on the previous day, he had entered the courtroom after court had been adjourned to speak with friends inside. When he entered, he saw the trial judge speaking to other local attorneys – Bruce Edwards and Margaret McManes. Ferris became concerned because he knew that Edwards and McManes were close to Swinson; that they considered

11

Swinson to be like a son to them; and that they were known to be Swinson's unofficial "adoptive parents." Ferris did not hear the conversation, but texted Williams's trial counsel to advise him of the situation. Ferris agreed that the jurors had already left the courtroom at the time of the conversation.

McManes testified that she and Edwards considered Swinson to be their "adopted son." She explained that after court had adjourned and the jurors were dismissed, she approached the trial judge and asked if she could discuss something unrelated to the case. She and the judge were standing near the exit door when they discussed her biological son's internship at the District Attorney's office the previous summer and thanked the judge for providing career advice to her son during his internship. The judge complimented McManes on her son's polite manners and discussed the difficulties of raising children with manners. McManes and the judge also discussed other local attorneys they knew, and then Edwards joined the conversation and discussed a friend that he had

recently encountered at a high school reunion. McManes testified that they never discussed anything about the pending trial.

A court reporter for another judge testified that she had entered the courtroom to locate Edwards on behalf of the Clerk of Court regarding an unrelated matter. At that time, court had already adjourned and the trial judge was speaking with McManes and Edwards. When she approached Edwards, she heard a portion of the conversation; they were discussing the poor health of another judge and the death of that judge's son. At that point, she told Edwards that he was wanted in the clerk's office and the conversation ended. She did not hear anyone discuss the case or Swinson. The assigned judge denied Williams's request to question the trial judge at the hearing and denied the motion that same day, making findings of fact and concluding that "a fair-minded and impartial person would not have a reasonable perception of a judge's lack of impartiality based upon objective facts set forth in the affidavit, facts of the case, or reasonable inferences therefrom."

13

We review a trial court's ruling on a motion to recuse for an abuse of discretion. See *Pierce v. State*, 319 Ga. 846, 863 (9) (907 SE2d 281) (2024). "When considering the issue of recusal, both OCGA § 15-1-8 and . . . the Code of the Judicial Conduct should be applied. The Code of Judicial Conduct provides a broader rule of disqualification than does OCGA § 15-1-8." *Barnett v. State*, 300 Ga. 551, 554 (2) (796 SE2d 653) (2017) (citation and punctuation omitted). Williams does not allege that any provision of OCGA § 15-1-8 is applicable here.[4] Rather, she relies on Rule 2.11 (A) of the

---

[4] This statute provides:

(a) No judge or Justice of any court, magistrate, nor presiding officer of any inferior judicature or commission shall:
> (1) Sit in any case or proceeding in which he is pecuniarily interested;
> (2) Preside, act, or serve in any case or matter when such judge is related by consanguinity or affinity within the third degree as computed according to the civil law to any party interested in the result of the case or matter; or
> (3) Sit in any case or proceeding in which he has been of counsel, nor in which he has presided in any inferior judicature, when his ruling or decision is the subject of review, without the consent of all parties in interest. In all cases in which the presiding judge of the superior court was

14

Georgia Code of Judicial Conduct, which provides that "[j]udges shall disqualify themselves in any proceeding in which their impartiality might reasonably be questioned." Specifically, Williams argues that, although the conversation at issue here might seem innocuous on the surface, it created the perception that the judge was sympathetic to the State's case by speaking with the victim's quasi-adoptive family while the trial was still pending.

---

employed as counsel before his appointment as judge, he shall preside in such cases if the opposite party or counsel agree in writing that he may preside, unless he declines to do so.

(b) No judge or Justice of any court, magistrate, nor presiding officer of any inferior judicature or commission shall be disqualified from sitting in any case or proceeding because of the fact that he is a policyholder or is related to a policyholder of any mutual insurance company which has no capital stock.

(c) Nothing in this Code section shall be construed as applying to the qualifications of trial jurors.

(d) In all cases in which a part-time judge has a conflict because such judge or his or her partner or associate represents a governmental agency or entity, a subdivision of government, or any other client, the judge will recuse himself or herself or, with the permission of the parties, transfer the case to the state or superior court, but such judge will not otherwise be disqualified or prohibited from serving as attorney for such governmental entities.

As an initial matter, we note that the trial judge properly referred the recusal motion to a neutral judge, who conducted a timely evidentiary hearing. See Ga. Unif. Super. Ct. Rule 25.3 ("If it is found that the motion [to recuse] is timely, the [required] affidavit sufficient and that recusal would be authorized if some or all of the facts set forth in the affidavit are true, another judge shall be assigned to hear the motion to recuse."); *Henderson v. State*, 295 Ga. 333, 334 (1) (759 SE2d 827) (2014) (outlining procedures when assessing a motion to recuse). And that neutral judge found no evidence that the parties involved discussed the pending trial in any way, and it is undisputed that there were no jury members present in the courtroom to witness the discussion. Because these findings are supported by evidence in the record, we conclude that the neutral judge did not abuse his discretion in determining, under a reasonable person standard, that the limited conversation unrelated to the pending trial did not result in the appearance of impropriety. See *Heidt v. State*, 292 Ga. 343, 348 (3) (736 SE2d 384) (2013)

16

(defendant failed to show judge's impartiality might reasonably be questioned where testimony regarding the judge's out-of-court statement merely showed the judge had expressed "some sort of agreement" to a third-party statement that defendant would not receive a fair trial in Effingham County, but failed to show the judge had revealed any bias against defendant); *Turner v. State*, 280 Ga. 174, 175-76 (626 SE2d 86) (2006) ("Keeping in mind the reality that any judge will have come to the bench after having had extensive contacts with the community, we conclude that [the judge's] limited contact with [the defendant] and her mother is not enough to call into question his impartiality in this case." (citation and punctuation omitted)).[5] Accordingly, this enumeration of error fails.

2. Williams next asserts that the trial court erred in refusing

---

[5] *Serdula v. State*, 344 Ga. App. 587 (812 SE2d 6) (2018), which Williams relies on, is readily distinguishable. In that case, the Court of Appeals concluded that the trial court erred in denying the defendant's motion to recuse without referring the motion to another judge. Id. at 591 (1) ("Even if the trial court were not inclined to recuse itself, at a minimum, the motion should have been referred to another judge.").

to charge the jury on self-defense, accident,[6] and voluntary manslaughter.

Williams's initial requests to charge included requests for accident, voluntary and involuntary manslaughter, justification generally, self-defense, defense of property, and defense of habitation. At the charge conference, Williams withdrew justification generally and defense of habitation. After the trial court declined to charge on accident, voluntary manslaughter, involuntary manslaughter, self-defense, and defense of property,[7] Williams renewed her objections, which the trial court denied. But the trial

---

[6] Although Williams did not separately enumerate the omission of the accident charge as error in her appellate brief, she did argue with citations to the record and citations to authority that the trial court erred in refusing to give a charge on accident. For these reasons, we conclude that this argument was not abandoned as the State argues. Cf. Supreme Court Rule 22 (1) ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned.").

[7] The trial court ultimately gave a charge on general affirmative defenses: "Ladies and Gentlemen, an affirmative defense is a defense that admits the doing of the act charged but seeks to justify, excuse, or mitigate it. Once an affirmative defense is raised, the burden is on the State to disprove it beyond a reasonable doubt."

court responded that Williams would, nonetheless, be able to argue self-defense in closing arguments, specifically referencing that Williams had testified that Swinson "threw her down twice" and "wouldn't leave" prior to the shooting.[8]

"[T]o authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge." *Wainwright v. State*, 305 Ga. 63, 70 (5) (823 SE2d 749) (2019) (citation and punctuation omitted). "We review de novo a properly preserved claim that a trial court erred in refusing to instruct the jury on an applicable principle of law." *Eubanks v. State*, 317 Ga. 563, 581 (3) (b) (894 SE2d 27) (2023) (citation and punctuation omitted).

(a) *Self-Defense*

Williams argues that the evidence showed that she was

---

[8] During closing argument, trial counsel argued that Swinson broke into Williams's house, stayed despite her request to leave, and "thr[e]w her around" before she got the gun and told him to "get the F out." Counsel also argued that Williams did not intend to kill Swinson and that the gun went off as the result of an accident.

preparing to defend herself when the gun fired accidentally and that she was, therefore, entitled to a charge on both self-defense and accident. "Although a defendant may assert both the defense of accident and the defense of self-defense, the defendant is entitled to charges on both only if slight evidence supports both charges." *Johnson v. State*, 319 Ga. 562, 570 (1) (c) (905 SE2d 570) (2024). Turning first to self-defense, we note that OCGA § 16-3-21 (a) provides that "[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force."

Williams has failed to point to even slight evidence that she reasonably believed at the time of the shooting that force was necessary to defend herself against Swinson's imminent use of unlawful force. Although Williams eventually claimed at trial that Swinson picked her up and threw her down upon coming into the

20

house, Williams's own testimony showed that whatever altercation occurred between her and Swinson had concluded at the time she decided to retrieve her gun. On cross-examination, she conceded that Swinson "did not do anything towards [her]" while she was holding the gun. Also, both Williams and Chad testified that Swinson was in Chad's bedroom when Williams went to retrieve her gun. And Chad testified that when he awoke with Swinson in his bedroom, Swinson told him that he wanted Chad "to be a witness to whatever happens," and showed Chad scratches on his back. Finally, there is no evidence that Swinson was armed that evening or that Williams was otherwise in immediate danger from Swinson at the time of the shooting. In short, while Williams and Swinson may have been engaged in a physical confrontation in a general sense, the evidence showed that the two had separated and that Swinson was not *imminently* attacking Williams when she shot him. See *Redding v. State*, 311 Ga. 757, 761 (3) (858 SE2d 469) (2021) (appellant's testimony that the victim threatened him earlier in the

evening did not show imminent danger); *Cloud v. State*, 290 Ga. 193, 196 (719 SE2d 477 (2011) ("Justification cannot be based on an assault which has ended."). Thus, we conclude that the trial court did not err in refusing to give a self-defense charge. See *Merritt v. State*, 311 Ga. 875, 890 (7) (860 SE2d 455) (2021) (trial court did not err by refusing to give self-defense charge where appellant pointed to no evidence that shooting the victim was necessary to defend himself or any third person from imminent use of unlawful force); *Garner v. State*, 303 Ga. 788, 790-91 (2) (815 SE2d 36) (2018) (trial court did not err by refusing to charge on self-defense where there was no evidence that appellant was in fear of suffering harm during the encounter with the victim or that the victim was reaching for a weapon).

(b) *Accident*

"To succeed on an affirmative defense of accident, the defendant must show that he acted without criminal intent, was not engaged in a criminal scheme, and was not criminally negligent,

22

that is, he did not act in a manner showing an utter disregard for the safety of others who might reasonably be expected to be injured thereby." *Mills v. State*, 287 Ga. 828, 832 (4) (700 SE2d 544) (2010). See also OCGA § 16-2-2 ("A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence.").

Here, Williams's own testimony showed that, after an evening in which she drank several glasses of wine, she retrieved her gun—that she knew to be loaded—from its holster and walked down the hall with the gun to Chad's room in order to "intimidate" Swinson and that she intentionally "raised the gun over [her] head" and then "swung it down to hit him on the head with it" while her finger was "probably" on the trigger. At a minimum, "[m]isuse of a firearm in the manner described by [Williams] shows a degree of culpability that constitutes criminal negligence." *Mills*, 287 Ga. at 832 (4) (because defendant was criminally negligent in climbing into bed

with victim holding a loaded handgun with his finger on the trigger and pointing the gun at the victim, defendant was not entitled to a charge on accident). Because "death caused by criminal negligence is not an accident," the trial court did not err in refusing to charge the jury on this defense. Id. (citation and punctuation omitted). See also *Bonner v. State*, 311 Ga. 466, 469-70 (3) (858 SE2d 496) (2021) (trial court did not err in refusing to charge on accident where, other than appellant's conclusory statement, no evidence suggested that the gun malfunctioned or that the shooting was accidental); *Stewart v. State*, 261 Ga. 654, 654 (2) (409 SE2d 663) (1991) (no accident charge required where defendant said pre-trial that he aimed a loaded gun at the victim's face to show her what "being under the gun" was like and also testified that he pulled a loaded gun across his lap to show her what "being under the gun was like"; both scenarios show criminal negligence). Cf. *Schmitt v. State*, 318 Ga. 835, 840-42 (1) (901 SE2d 102) (2024) (trial court error in denying accident charge as defense to malice murder count was not harmless

24

where appellant's theory of accident did not rest on conduct that was criminally negligent).

(c)  *Voluntary Manslaughter*

Williams also argues that her testimony that Swinson entered her home and "tossed [her] down" was sufficient to require the trial court to charge the jury on voluntary manslaughter. We disagree.

OCGA § 16-5-2 (a) provides:

> A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

We have consistently held that fear of attack and fighting are not the kind of "serious provocation" that can reduce the offense of murder to voluntary manslaughter. See *Behl v. State*, 315 Ga. 814, 816 (1) (885 SE2d 7) (2023) ("[N]either fear that someone is going to

25

pull a weapon nor fighting are the types of provocation that demand a voluntary manslaughter charge." (citation and punctuation omitted)); *Johnson v. State*, 313 Ga. 698, 700 (873 SE2d 123) (2022) ("The fact that an uninvited guest approaches the defendant's door, knocks on the door, and then does not immediately comply with a request to leave" does not constitute the provocation necessary to support voluntary manslaughter.); *Williams v. State*, 306 Ga. 717, 721 (2) (832 SE2d 805) (2019) (voluntary manslaughter requires that a defendant "was so angered that he reacted passionately," not merely that the defendant "was attempting to repel an attack"). Thus, the evidence that Swinson entered Williams's home and fought with her does not demonstrate the type of circumstances that we have found would excite such passion in a reasonable person to justify a voluntary manslaughter charge. Accordingly, the trial court did not err in refusing to charge the jury on voluntary manslaughter.

3. Lastly, Williams alleges that her trial counsel rendered constitutionally ineffective assistance by withdrawing the request to

charge the jury on defense of habitation because the evidence showed that she was defending her home when she accidentally shot Swinson.[9]

To prevail on her claim, Williams must show both that counsel's performance was deficient and that the deficient performance prejudiced her defense. See *Strickland v. Washington*,

---

[9] OCGA § 16-3-23 provides:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;

(2) That force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred; or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "To prove deficient performance, a defendant must show that [her] counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Pyne v. State*, 319 Ga. 776, 779 (1) (906 SE2d 755) (2024) (citation and punctuation omitted). "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Perkins v. State*, 313 Ga. 885, 901 (5) (873 SE2d 185) (2022). If Williams fails to make a sufficient showing on one part of the *Strickland* test, we need not address the other. See *Bowman v. State*, 319 Ga. 573, 576-77 (2) (905 SE2d 605) (2024).

Pretermitting whether counsel was deficient in withdrawing the request to charge on the defense of habitation and whether there was slight evidence to support the charge, Williams has failed to show prejudice. The evidence supporting this defense was weak, and the evidence of Williams's guilt was strong. Williams claimed at trial

that Swinson entered her home with force and "tossed [her] down" and that she went to get her gun in order to tell Swinson to leave. But crime scene photographs and Chad's testimony showed that nothing was out of place in the living room area where the altercation was alleged to have taken place, other than Swinson's cell phone on the floor. Also, Swinson was unarmed and had retreated to Chad's bedroom when Williams went to get her gun. And Chad testified that Swinson had asked him to "be a witness to whatever happens." Moreover, in her call to the 911 operator and when questioned by law enforcement officers after the shooting, Williams never claimed that she accidentally shot Swinson while attempting to make him leave her home; instead, she explained that she accidentally shot Swinson while they were arguing and breaking up.

Other evidence also supported that Williams shot Swinson out of anger. Williams admitted to the 911 operator that she "didn't realize that [she] had the trigger pulled." Also, Swinson's

grandmother and uncle confirmed that Swinson and Williams had been fighting earlier in the evening, and Swinson had significantly more physical injuries than Williams despite Williams's testimony that Swinson had thrown her over the couch. Finally, the State presented evidence that Williams had a history of threatening to shoot her romantic partners without provocation.[10]

Accordingly, because Williams has not shown that there is a reasonable probability that the result of her trial would have been different but for counsel's withdrawal of the request to charge on the defense of habitation, her claim of ineffective assistance of counsel fails. See *State v. Newman*, 305 Ga. 792, 797-98 (2) (a) (827 SE2d 678) (2019) (in the context of plain error, trial court's failure to charge on defense of habitation "did not likely affect the outcome of the trial court proceedings" in light of the compelling evidence of defendant's guilt); *Barrett v. State*, 292 Ga. 160, 178-79 (3) (c) (5)

---

[10] Williams does not claim on appeal that this evidence was improperly admitted, and we express no opinion on that issue.

(733 SE2d 304) (2012) (no prejudice shown from counsel's failure to request defense of habitation charge where defendant's own testimony would not have established reasonable belief that deadly force was necessary to prevent unlawful entry into residence); *Hill v. State*, 290 Ga. 493, 500 (7) (722 SE2d 708) (2012) (appellant failed to show prejudice where evidence of his guilt was overwhelming and he did not establish how a jury charge on defense of habitation would have raised a reasonable probability that the outcome of the case would have been different).

*Judgment affirmed. All the Justices concur.*