**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and WATKINS, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 28, 2025**

# In the Court of Appeals of Georgia

A25A1269. WILSON v. THE STATE.

BROWN, Chief Judge.

Following a jury trial, Emer Wilson was convicted of aggravated sodomy, three counts of child molestation, and cruelty to children in the first degree.[1] Wilson filed a motion for new trial, which the trial court denied. She appeals from the trial court's order, asserting that her trial counsel rendered ineffective assistance of counsel when he failed to procure witness Brandi Hurst for trial, that the trial court erred by failing to compel Hurst's attendance at the motion for new trial hearing, and that the forensic expert witness bolstered the credibility of the victim. We find no error and affirm.

---

[1] Three other defendants were also charged with sexual offenses against the victim, including her parents, Rachel Merrell and Dillon Godfrey, and Jason Hendricks, but they are not parties to this appeal.

"On appeal from a criminal conviction, a defendant no longer enjoys the presumption of innocence, and the evidence is viewed in the light most favorable to the guilty verdict." (Citation and punctuation omitted.) *Anderson v. State*, 348 Ga. App. 322 (822 SE2d 684) (2018). So viewed, Ashley Bramlett, who was employed with the Gilmer County Department of Family and Children Services ("DFCS" or the "Department"), testified that the Department first became involved with the children in July of 2019, when Wilson, the children's maternal grandmother, called law enforcement to report that the children's mother had shown up and tried to take R. M. M., the victim herein, and her siblings, T. B. and E. M.[2] The children had been removed from their mother's custody in July 2019, and had been placed in the home of their maternal great-grandmother, M. M., with whom Wilson lived. The children lived with them until November 2020. Bramlett was a supervisor at the time and was familiar with both the children's mother and Wilson, as both had an extensive history with the Department.

In November, 2020, Brandi Hurst, the previous foster care supervisor, who had become the case manager in November 2019, left the Department, and Bramlett took

---

[2] The mother had a fourth child, R. M., who was removed from her custody at birth due to the presence of drugs in his urine.

over the case as the foster care supervisor. Bramlett remained in a supervisory role but assigned the case to Ashley Bryant and instructed her to meet the families, placements, children, and "collaterals."[3]

Bryant testified that she became involved on November 1, 2020, when the kids were five (T. B.), four (R. M. M.), and three years old (E. M.) and five days old (R. M.), and the plan was to give M. M. guardianship of the children. On November 4, however, Tammy Ledford, who was the director of the daycare center where R. M. M. and E. M. were students, contacted Bryant to report that R. M. M. and E. M. said that they were living with their mom, who, at that time, was only allowed supervised visits by DFCS. Bryant visited T. B., who confirmed that they were living with their mom and told her he had not been sleeping well. Bryant testified that T. B. had very dark circles under his eyes, very red ears, and looked very defeated. Bryant also visited R. M. M. and she, too, confirmed that the children were living with their mom. The children were removed from the great-grandmother's home on November 12, 2020. Because there was no foster home that could take all three children, E. M. and R. M. M. were placed with Rebecca Scott, and T. B., with a paternal relative.

---

[3] "Collaterals" referred to other people who were in contact with the children.

Scott testified that she picked R. M. M. and E. M. up from daycare on November 12, 2020, and that they looked rough and were sad. Scott described R. M. M. as very spunky, sweet, intelligent, extremely shy, and very mature. Scott testified that although R. M. M. was only four years old at the time, she was very knowledgeable about the female body and talked very openly about her brother's penis and her vagina during bed time.

In March of 2021, R. M. M. told Scott that things happened at her Nana's house (referring to Wilson), including "bad guys" taking her outside and doing things to her. Scott immediately called Bryant, who advised Scott to document what R. M. M. was saying but not to question her. As a result of R. M. M.'s disclosure, Bryant scheduled a forensic interview. Scott took R. M. M. to three forensic interviews and a medical exam and observed that R. M. M. seemed unaffected during the forensic medical exam. The pediatric nurse practitioner who performed the exam testified that she saw no evidence of injury and explained that only ten percent of examinations reveal injuries. She also explained that with younger children, the chance to collect DNA or evidential samples is best during the first three days after contact because young children heal so quickly due to vascularization.

Jana Crump, who fostered T. B., testified that he was very aggressive towards her children and would hit them whenever he was frustrated and used very foul language. On one occasion, she walked into her sons' room, noticed that T. B.'s underwear was turned sideways, and when she asked what happened, her son told her "[T. B.] was kissing my butt," and T. B. told her "Well, I was making [the son] kiss my dinger," which is the term they used for penis. When she asked T. B. where he had seen that before, he told her he had seen his mother do that. T. B. also told Crump that he had nightmares about the four defendants and that he and R. M. M. were forced to touch each other.

Lisa Broussard, the forensic interviewer and state's expert witness, explained the process and barriers to disclosure and discussed the family dynamics that come into play when an abuser is a family member. When Broussard went over anatomical drawings with R. M. M., the child described the male genitalia as a "penis" and the female genitalia as the "tee-tee spot." Broussard first interviewed R. M. M. on April 27, 2021, when she was four years old. The interview was published for the jury, along with two other forensic interviews Broussard conducted with R. M. M. During the first interview, R. M. M. disclosed that both co-defendants Dillon and Jason "tee-teed

on her leg" and Dillon "stuck his penis in her tee-tee spot," and Nana watched them do it. When she asked Nana to make them stop, she told her it was okay for them to do it. R. M. M. also disclosed that Wilson took off her clothes and put her "tee-tee spot on [R. M. M.'s] tee-tee spot" and "tee-teed on [the child's] tee-tee spot."

In the second interview a week later, R. M. M. told her that "Nana made me touch [T. B.'s] penis." She stood and demonstrated, stating "Nana caught my hand and put my hand on [T.B.'s] tee-tee spot." R. M. M. also said that Wilson made her put her mouth on Wilson's vagina, demonstrating as if she were putting her head between her own legs, that "[t]he smell was yucky or gross," and that Wilson made her put her hand on Wilson's vagina.

In the third interview in May 2021, which Broussard testified was necessary because of the number of people involved, R. M. M. told Broussard that Nana would let her friends do things to her. R. M. M. stated they were stretching her, "tee-teeing on her legs," and "two got my arms, two got my legs." R. M. M. said that it hurt her tummy, and when Broussard tried to get an exact location for the pain, R. M. M. said she had to use the restroom. She also disclosed that Jason poked her vagina with a pencil and that she poked Wilson's vagina with a pencil.

In the fourth interview , R. M. M. viewed photographs, which she described at "bad Dad's [house]," "bad Nana's house," and "bad mom's camper." She identified her mother as "bad mom," and Wilson as "bad Nanny." R. M. M., who was five years old by the time of trial, testified very reluctantly. When asked about Wilson, she testified that she lived with Nana "a long time ago" but refused to identify her in court and said she did not want to look at her.

Investigator Carol Daves interviewed Wilson twice. Wilson's interviews were played for the jury, and she denied committing the offenses throughout both interviews. In the first interview, Wilson stated that she and her mother were caregivers for R. M. M. and her siblings. She said she never washed R. M. M.'s vagina and later yelled that the child washed her own vagina. She disclosed that her daughter [and codefendant], Rachel, told her that defendant Hendricks masturbated on her stomach when she was seven years old and that it was the most fatherly thing he could have done because he warned her that she was dressing provocatively and explained that another man might not have stopped like he did. When Investigator Daves suggested that this conduct should have made her wary of having Hendricks around, Wilson responded by commenting that Rachel had framed his action as "fatherly."

7

Wilson recalled another incident where Rachel was molested but explained that she understood Rachel initiated the contact.

In the second interview, Wilson initially denied having sex in front of the children but eventually recalled that on one occasion, R. M. M. woke up while Wilson was having sex nearby. Wilson talked about how she was molested as a child, which was much worse, and stated that "hurt people hurt people." At one point, Wilson stated that maybe R. M. M. did not want to come back to her because she had not protected her. At the conclusion of her investigation, Daves obtained arrest warrants for the four defendants.

Wilson proceeded to trial and a jury convicted her of aggravated sodomy, three counts of child molestation, and cruelty to children in the first degree. She filed a motion for new trial, which the trial court denied. This appealed followed, in which Wilson does not challenge the sufficiency of the evidence but asserts a claim of ineffective assistance of counsel for the failure to secure Brandi Hurst as a witness, that the trial court erred by not compelling Hurst's testimony, and that the forensic expert improperly bolstered R. M. M.'s testimony. As discussed in detail below, we find no error.

1. Defendant argues that trial counsel was ineffective for failing to subpoena Hurst to testify at trial. The State listed Hurst as a witness on its witness list but failed to call her as a witness. Because Hurst was the children's caseworker at the time the alleged events took place, Wilson maintains that her defense was harmed because Hurst would have testified that she saw no evidence of abuse, as she reported in the DFCS case file. We find that there is no merit to Wilson's ineffectiveness claim.

To prevail on her claim that her trial counsel rendered ineffective assistance of counsel,

> [Wilson] must show both that counsel's performance was deficient and that the deficient performance prejudiced her defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, a defendant must show that her counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. If [Wilson] fails to make a sufficient showing on one part of the *Strickland* test, we need not address the other.

(Citations and punctuation omitted.) *Williams v. State*, 320 Ga. 592, 603 (3) (910 SE2d 566) (2024)). Pretermitting whether counsel's performance was deficient, Wilson

cannot establish prejudice, and consequently, cannot establish ineffective assistance of counsel.

Bramlett testified that Hurst left the Department in November 2020, and the case was assigned to Bryant. Once Bryant completed her assessment, she reported serious safety concerns based on her communication with the children's daycare providers and her actual visits with the children. This led Bramlett to review the DFCS records with even more scrutiny, and she noted discrepancies in the record. In the DFCS records, Hurst had reported that daycare director Tammy Ledford indicated that the children were doing well at their maternal great-grandmother's home, but Ledford's testimony conflicted with Hurst's reports. Ledford testified that to the extent the records reflected that she reported that the children were well in July 2020, they were incorrect. Ledford testified that R. M. M. had been very happy before the kids left daycare due to Covid. When the children returned to daycare after Covid had begun, their behavior had changed. R. M. M., who was completely potty trained before, and E. M. began to have bouts of wetting themselves and diarrhea. They both experienced bouts of crying and withdrew from friends and eating. T. B. started acting

out and scratching other children and refused to nap. Ledford testified that she informed Hurst of her concerns to no avail.

Wilson argues that the above-referenced testimony made Hurst's testimony crucial to her defense because Hurst would have supported her findings in the DFCS records that the children were happy and safe during the pertinent time. But Wilson offered other evidence that the children were safe during that time. RieVette Parks, who worked at the daycare at the pertinent time and was R. M. M.'s teacher in 2020, testified that she spent time with R. M. M. and E. M., that she observed that both kids loved Wilson, and that she had no indication that the children were in physical or sexual danger. Parks recalled that she was shocked and heartbroken when she learned of the investigation because she had not seen any signs of abuse when she was with the children. Dr. Muhammad Akmal, the children's physician, testified that Wilson brought all three children to his office for several visits during the pertinent time, and he did not suspect physical injury or signs of abuse when he saw the children.

Presuming Hurst's testimony would have aligned with her reporting in the DFCS records, it would have been cumulative of other evidence offered by Ms. Parks and Dr. Akmal. The failure to offer cumulative evidence does not constitute

11

ineffective assistance of counsel. *Cochran v. State*, 305 Ga. 827, 831 (2) (a) (828 SE2d 338) (2019) (failure to subpoena officer whose testimony would have been cumulative of other testimony did not establish ineffective assistance); *Wesley v. State*, 286 Ga. 355, 358 (3) (h) (689 SE2d 280) (2010) (recognizing that trial counsel's failure to present evidence that a crack pipe was found on the victim's person after he was murdered did not amount to ineffective assistance where other witnesses corroborated appellant's claim that victim was a drug dealer); *Gaspar-Mateo v. State*, ____ Ga. App. ____ (2) (b) (Case No. A25A1202, Sept. 12, 2025) (failure to subpoena school records to challenge victim's credibility where other witnesses testified to much of the information in the records did not establish prejudice prong of ineffectiveness claim).

"To show prejudice, a defendant must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations and punctuation omitted.) *Sims v. State*, 321 Ga. 627, 634 (4) (916 SE2d 406) (2025). Wilson has not established that the outcome would have been different, particularly in light of the jury's opportunity to judge the credibility of the victim and other witnesses, to watch the forensic interviews of R. M. M., and to

listen to Wilson's statements when she was interviewed. Accordingly, Wilson has not established ineffective assistance of counsel.

2. Next, Wilson argues that the trial court erred because it should have compelled Hurst's testimony through a court-ordered subpoena or a material witness warrant at the hearing on the motion for new trial. Again, we disagree.

On May 30, 2024, Wilson first requested a continuance to subpoena Hurst and her trial counsel as witnesses at the hearing on her motion for new trial, which the trial court granted, setting a hearing date in August 2024. The hearing was later continued to November 20, 2024. On November 11, 2024, defendant filed a motion for court-ordered service of a subpoena, or in the alternative, a material witness warrant for Hurst, alleging that Hurst had evaded a defense subpoena during the trial of the case and that she continued to evade service.[4] The hearing proceeded on November 20, 2024, and Hurst was not in attendance.

Wilson argues that this Court should remand the case so that such an order can be issued to require Hurst to testify at another hearing on the motion for new trial because her testimony was central to Wilson's defense. Alternatively, Wilson argues

---

[4] The record does not contain a ruling on Wilson's motion.

that a continuance should have been granted to allow additional time to subpoena Hurst. For the reasons discussed in Division 1, this argument fails because Hurst's proffered testimony was cumulative of other evidence offered in the case, and we cannot find that the trial court abused its discretion when it did not grant a continuance.

> Pursuant to OCGA § 17-7-191,
>
> [t]he defendant may, upon application to the committing judicial officer or to the clerk of the court to which he is committed or bound to appear for trial, obtain subpoenas for such witnesses as he deems material for his defense. The judicial officer or the clerk of the court shall issue such subpoenas requiring the witnesses to appear at the term of the court to which the defendant is committed or bound to appear and until his case is ended.

This statute therefore authorizes a Georgia court to compel the attendance at a Georgia criminal trial of a person anywhere within Georgia, see *Davenport v. State*, 289 Ga. 399, 400 (711 SE2d 699) (2011), provided the witness has been subpoenaed. See *Schramm v. State*, 286 Ga. App. 156, 158 (2) (648 SE2d 392) (2007) ("the trial court could not compel the witness to testify when Schramm failed to subpoena the witness"). Even if we presume that the failure to subpoena Hurst or to require her to

14

appear was error, harm as well as error must be shown for reversal. See *Morrell v. State*, 313 Ga. 247, 261 (2) (c) (869 SE2d 447) (2022). Wilson cannot establish harm because Hurst's proffered testimony was cumulative of other evidence offered in the case, and the evidence was otherwise sufficient to support Wilson's guilt.

Wilson also argues that a continuance should have been granted to afford her more time to subpoena Hurst. But the record establishes that she did not move for a continuance after the trial court denied her motion for court-ordered service of a subpoena upon Hurst. By failing to do so, Wilson has waived her right to assert this error on appeal. See *Walton v. State*, 242 Ga. App. 639, 640 (1) (530 SE2d 531) (2000). Even if Wilson had moved for a continuance, however, we would find no error.

> In considering a motion for continuance, the trial court enjoys broad discretion and may grant or refuse the motion as the ends of justice may require. To obtain a new trial based upon the denial of a motion for a continuance, an appellant must show not only a clear abuse of discretion on the part of the trial court in denying the motion but also that [she] was harmed by that denial.

(Citation and punctuation omitted.) *Blalock v. State*, 316 Ga. 330, 338 (1) (888 SE2d 98) (2023). Again, Wilson cannot establish harm because Hurst's testimony would have been cumulative of other evidence offered in the case.

15

3. In her last enumerated error, Wilson argues that the trial court committed plain error when it allowed Broussard, the forensic interviewer, to bolster R. M. M.'s credibility and invade the province of the jury. "A plain error is one that is so clearly erroneous that it creates a likelihood of a grave miscarriage of justice or seriously affects the fairness, integrity, or public reputation of the judicial proceeding." (Citation and punctuation omitted). *Crapps v. State*, 329 Ga. App. 820, 825 (2) (766 SE2d 178) (2014). No plain error occurred.

Broussard was asked "And based on your training, education, and experience, did [R. M. M.] disclose sexual abuse to you?" She responded "In her words, she disclosed child sexual abuse." This does not constitute improper bolstering. "[I]mproper bolstering occurs when an expert witness is allowed to give his or her opinion as to whether the complaining witness is telling the truth, because that is an ultimate issue of fact and the inference to be drawn is not beyond the ken of the average juror." (Citation and punctuation omitted.) *Smith v. State*, 342 Ga. App. 656, 663 (2) (805 SE2d 251) (2017).

In *Wiggins v. State*, 338 Ga. App. 273 (787 SE2d 357)(2016), the State's expert witness was asked, "And all the kids that you see in therapy and counseling, these are

children at your place who have been sexually abused, correct?," and she replied "Correct. I don't see clients who have not made a disclosure in the interview process. There has to have been some sort of disclosure made and the detectives feel that it's a credible disclosure." (Punctuation omitted.) Id. at 279 (4). The defendant argued improper bolstering, and we held that the "testimony was not a clear comment on the victim's credibility as to her allegations of molestation" and therefore did not constitute improper bolstering. (Punctuation omitted.) Id. at 281 (4). See also *Strickland v. State*, 311 Ga. App. 400, 403 (a) (715 SE2d 798) (2011) (detective's testimony that he ended interview of child and referred her to a child advocacy center when he "ascertained that a molestation incident occurred" was not improper bolstering but rather an explanation as to why he ended the interview); *Ward v. State*, 353 Ga. App. 1, 7 (2) (b) (836 SE2d 148) (2019) (expert may testify as to observations of the victim and that victim's description of the molestation did not appear to be coached even though it may indirectly, though necessarily, involve the child's credibility). Compare *Gilmer v. State*, 339 Ga. App. 593, 595 (2) (a) (794 SE2d 653) (2016) (expert's comment that victim's spontaneity and genuineness added credibility

to her statement constituted improper bolstering). Because no improper bolstering occurred, this enumeration of error also fails.

*Judgment affirmed. Barnes, P. J., and Watkins, J. concur.*