NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 17, 2026

S25A1429.  MURPHY v. THE STATE.

LAND, Justice.

Dachavous Murphy appeals his convictions for felony murder and other crimes stemming from the shooting death of Ashley Brown at a nightclub in Augusta.[1] On appeal, Murphy argues that the trial

---

[1] The crimes took place on September 15, 2011. On December 13, 2011, a grand jury indicted Murphy for felony murder (Count 1), possession of a firearm during the commission of a crime (Count 2), criminal damage to property in the first degree (Count 3), and aggravated assault (Count 4). After trial, on August 7, 2014, a jury returned a verdict of guilty on all four counts of the indictment. Murphy was sentenced to life in prison without parole for Count 1; five years in prison for Count 2, to be served consecutively to Count 1; ten years in prison for Count 3, to be served consecutively to Count 2; and twenty years in prison for Count 4, to be served consecutively to Count 1. The charges against Murphy's codefendant, Robert Wright, were dismissed based on Wright's guilty plea to a reindictment on lesser charges.

Murphy filed a timely motion for new trial on August 13, 2014, which was amended twice through new counsel on March 4, 2022 and March 10, 2022. After a series of hearings on March 16, 2022, May 17, 2022, and February 20, 2023, the trial court denied the motion as amended on October 26, 2023, and Murphy filed a timely notice of appeal. The case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

We note that there was over a 9 year delay between the time Murphy's

court abused its discretion by excluding certain evidence as inadmissible hearsay, that the State violated *Brady*[2] by failing to disclose evidence favorable to Murphy prior to trial, that the trial court abused its discretion by denying Murphy's request for a continuance, and that the trial court erred in making certain charges to the jury. Murphy also argues that Count 4 of the indictment fails to comply with due process and that trial counsel rendered ineffective assistance for failing to call two witnesses whose testimony would have contradicted the testimony of the State's eyewitnesses. For the reasons below, we affirm Murphy's convictions.

1. The evidence presented at trial showed as follows. Murphy

---

initial motion for new trial was filed and the time that the trial court ultimately ruled on Murphy's motion as amended. While this delay may have at least in part been the result of the multiple substitutions of counsel that took place prior to the trial court's ruling on Murphy's amended motion as well as delays resulting from the preparation of the trial transcript, we remind the participants in this case and others involved in the criminal justice system that "it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." *Owens v. State*, 303 Ga. 254, 258 (2018).

[2] *Brady v. Maryland*, 373 US 83 (1963).

and his codefendant, Robert Wright, went to Club 5150 in Augusta in the evening hours on September 14, 2011. Several members of the Daggett family also went to Club 5150 that same evening. In the early morning hours of September 15, a fight broke out on the dance floor between the Daggett family and another group of people from "Harrisburg," which included Murphy. Security broke up the fight and club staff forced all patrons to leave the club. Brown, who was at the club with friends celebrating a birthday, was among the patrons forced to leave the club.

A security guard for the club witnessed Murphy leave the club and walk to a dark-colored vehicle, where Murphy displayed a firearm. Murphy entered the car, which drove to the front of the club. Eyewitnesses testified that Murphy, who was sitting in the passenger's seat, then fired several shots into the crowd gathered in the foyer of the club. One of those shots struck Brown in the head; she died from her injuries.

On September 20, 2011, investigators interviewed Murphy. Although investigators did not place Murphy under arrest at that

time, they administered him *Miranda*[3] rights, and Murphy agreed to speak to investigators. During the interview, Murphy admitted that he went to Club 5150 with Wright on the night of the shooting. He claimed that they left the club together, that no one else drove with them in the vehicle, and that neither he nor Wright fired shots that night. Murphy also claimed at that time that he did not have any "beef or conflict" with "any of the people on the other side of the fight."

Murphy was later identified by two eyewitnesses, Stanley Curry and Devin Basket, as the shooter. On September 23, investigators arrested Murphy and reinterviewed him. Investigators re-administered *Miranda* rights to Murphy, and Murphy agreed to waive those rights and speak to investigators. Murphy again stated that he and Wright were the only people in Wright's car that night and that neither of them fired shots.

In December 2011, the lead investigator, Chris Langford, began receiving letters from Murphy. In January 2012, Langford

---

[3] *Miranda v. Arizona,* 384 US 436 (1966).

again administered *Miranda* rights to Murphy; Murphy waived them and agreed to speak to the investigator. This time, Murphy stated that he left Club 5150 with Roosevelt Ellison, not Wright, in Ellison's black Camry or Corolla, and that Ellison "reach[ed] over with his right arm and [shot] behind him out the back passenger window." Murphy also acknowledged that the fight at Club 5150 stemmed from a prior dispute.

At trial, Murphy called Wright, Kevin Brown ("Kevin"), and Davario Glover as defense witnesses. Wright testified that Murphy left Club 5150 with Ellison, not Wright, in Ellison's black Toyota Camry.[4]  Wright left Club 5150 separately and drove to Ellison's house, where he testified that he saw Ellison with a gun in his waistband. Wright also testified that he saw Ellison removing shell casings from the back seat of his Camry.

Kevin testified that he was at Ellison's house after the shooting

---

[4] In his first two interviews with law enforcement, however, Wright stated that he left the club in his car with Murphy and that there was "no way that [Murphy] was the shooter because [Murphy] left with [him]" and Wright couldn't "be around guns because [he was] on probation at the time." Wright testified that he lied in these first two statements.

and that he saw Ellison with a 9mm gun. Glover, Murphy's brother, testified that he was at Ellison's house after the shooting, that he saw Ellison with a 9mm gun, and that he saw Ellison "washing his hands with gas[oline]."

2. Murphy argues that the trial court abused its discretion by excluding hearsay testimony from Glover, Kevin, and Wright about Ellison's statements and Ellison's phone call with Wright in which he admitted to shooting a gun of the caliber that killed Brown the night of the incident giving rise to this case. Specifically, Murphy argues that this evidence should have been admitted under OCGA § 24-8-804(b)(3) ("Rule 804(b)(3)") as statements against interest and under the residual hearsay exception, OCGA § 24-8-807 ("Rule 807"). For the reasons that follow, we conclude that the trial court did not abuse its discretion in excluding this evidence, and we accordingly reject Murphy's contentions. See *Atkins v. State*, 310 Ga. 246, 250 (2020) ("[A] trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion.").

6

On October 13, 2011, while Wright was in jail, Wright called Ellison, and Ellison admitted responsibility for shooting a handgun the night of Brown's death. This call was recorded. According to Wright, Ellison claimed that he "let loose," meaning shot, a 9mm handgun that night and knew that a handgun of that caliber was responsible for Brown's killing. Wright later testified that Ellison was "very concerned" about the incident, though he was "unsure" whether his gun had shot the bullets that killed Brown. In the recording, Ellison admitted to shooting the night Brown was killed, but he claims that he was not the only person shooting that night and that Murphy also had a gun.

Langford subsequently interviewed Ellison, and Ellison admitted that he was at Club 5150 the night of the shooting but denied firing his gun. Instead, Ellison claimed that his call with Wright was a "scheme" because he was "friends with them" and that Murphy and Wright were "supposed to give him money."

Ellison invoked his Fifth Amendment right against self-incrimination and did not testify at trial. Murphy sought to admit

the recorded phone call between Wright and Ellison in which Ellison admitted to shooting a gun of the same caliber that killed Brown the night of the shooting under the hearsay exception for statements against interest pursuant to Rule 804(b)(3). During pretrial argument, the trial court ruled that evidence regarding what Ellison told others, including the jailhouse phone call, was inadmissible because there were not "sufficient foundational factors to indicate an indicia of reliability." In its written order denying Murphy's motion for new trial, the trial court stood by its earlier ruling and explained that Ellison's hearsay statements claiming responsibility for shooting a firearm on the night of the crime were not supported by corroborating circumstances that clearly indicated the trustworthiness of those statements, a precondition for the admissibility of those statements under OCGA § 804(b)(3)(B) ("Rule 804(b)(3)(B)"). The trial court's order also ruled that the statements were not admissible under Rule 807, the residual hearsay exception, for the same reason. Consistent with this ruling, the trial court also excluded similar testimony from Kevin and Glover that they heard

8

Ellison claim responsibility for shooting a firearm that night.

(a) Murphy first argues that Ellison's statements were admissible under the hearsay exception for statements against interest. See OCGA § 24-8-804(b)(3). This argument fails.

Under Rule 804(b)(3), a statement against interest is an out of court statement made by a person who is unavailable at trial:

(A) Which a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate a claim by the declarant against another or to expose the declarant to civil or criminal liability; and

(B) Supported by corroborating circumstances that clearly indicate the trustworthiness of the statement if it is offered in a criminal case as a statement that tends to expose the declarant to criminal liability[.]

There is no dispute that Ellison was unavailable to testify at trial because he asserted his Fifth Amendment privilege against compelled self-incrimination and that assertion was accepted by the trial court. *Shealey v. State*, 308 Ga. 847, 852 (2020).

We agree with the trial court that Ellison's hearsay statements

9

appear to be against his interest since they are, on their face, admissions of criminal activity. We accordingly agree with Murphy's argument that subsection (A) of Rule 804(b)(3) is satisfied.

Because Ellison's hearsay statements were offered in a criminal case and would tend to expose him to criminal liability, subsection (B) applies to these statements and requires an analysis of whether those statements were "[s]upported by corroborating circumstances that clearly indicate the trustworthiness of the statement[s.]" OCGA § 24-8-804(b)(3)(B). The trial court is the gatekeeper for this type of evidence and is tasked with making that determination in the first instance. We are then tasked with assessing whether the trial court's decision is supported by any evidence and deciding whether it abused its discretion when admitting or excluding such evidence. See *State v. Hamilton*, 308 Ga. 116, 121 (2020) ("We review a trial court's evidentiary rulings for an abuse of discretion.").

For the reasons discussed below, we conclude that there is evidence in the record supporting the trial court's determination

10

that Ellison's hearsay statements were not supported by corroborating circumstances that clearly indicated the trustworthiness of those statements and that the trial court did not abuse its discretion by excluding those statements.

We have not previously had the opportunity to consider the trustworthiness requirement of Rule 804(b)(3)(B). Because "OCGA § 24-8-804 is the counterpart to Rule 804 of the Federal Rules of Evidence," when we consider the meaning of Rule 804(b)(3)(B)'s trustworthiness requirement, we may "consider the decisions of federal appellate courts, particularly the decisions of the United States Supreme Court and the Eleventh Circuit, construing and applying our rule's federal counterpart."[5] *Bolling*, 300 Ga. at 698 (footnote omitted).

---

[5] Cases from the United States Supreme Court and the United States Court of Appeals for the Eleventh Circuit decided prior to the effective date of Georgia's new Evidence Code have precedential value because the "General Assembly was crystal clear in conveying its intent that Georgia's new Evidence Code was primarily enacted to adopt the Federal Rules of Evidence ... 'as interpreted' by the federal appellate courts as of the effective date of the new Code." *State v. Almanza*, 304 Ga. 553, 558 (2018). "While still persuasive authority, any subsequent federal appellate case law lacks the same precedential weight as cases before that date." Id. at 559 n.5.

11

In examining Federal Rule 804(b)(3)(B)'s trustworthiness requirement, the United States Court of Appeals for the Eleventh Circuit has determined that "[i]n order for a declaration against penal interest to be trustworthy evidence, the statement must actually have been made by the declarant, *and it must afford a basis for believing the truth of the matter asserted.*" *United States v. Bagley*, 537 F2d 162, 167 (5th Cir. 1976) (emphasis added).[6] In determining whether a hearsay statement sought to be admitted under Federal Rule 804(b)(3)(B) is trustworthy, courts may consider the "totality of evidence in the … case" and the evidence developed at trial. *United States v. Robinson*, 635 F2d 363, 364 (5th Cir. 1981). See also *United States v. US Infrastructure, Inc.*, 576 F3d 1195, 1209 (11th Cir. 2009) (determining that a statement is trustworthy where "it [is] unlikely, judging from the circumstances, that the statement was fabricated" and that "the evidence presented at trial supports

---

[6] Decisions of the former United States Court of Appeals for the Fifth Circuit rendered before the close of business on September 30, 1981, are binding in the Eleventh Circuit. See *Bonner v. City of Prichard*, 661 F2d 1206, 1209 (11th Cir. 1981) (en banc).

12

the veracity of the out-of-court statement"); *United States v. Thomas*, 571 F2d 285, 290 (5th Cir. 1978) (looking at evidence in the record that "indicates the trustworthiness of the statement" in addition to noting that the possibility of fabrication was "slight").

Murphy argues that Ellison's statements are sufficiently trustworthy pursuant to Rule 804(b)(3)(B) because his phone call with Wright was recorded and because three other people – Kevin, Glover, and Ted Shelley – would have testified that Ellison also told them he was shooting that night. In essence, Murphy's argument is that this hearsay evidence is trustworthy because several witnesses claimed they heard Ellison make these statements and because Ellison's statements to Wright were evidenced by a recording. In other words, Murphy argues that the statements should have been admitted because the evidence that the statements were actually made by Ellison is trustworthy.

Murphy's focus on whether Ellison's hearsay statements were actually made by him is an incomplete analysis of what the trial court may consider in determining whether Ellison's statements are

13

admissible. Here, no one has questioned whether Ellison actually made out of court statements claiming to be one of the shooters. The recording of his conversation with Wright confirms that he did in fact make at least one statement to this effect. That is not the issue that was decided by the trial court and is not the only inquiry under Rule 804(b)(3)(B). Rather, because the State would have no way to cross-examine the non-testifying declarant if these statements were admitted, Rule 804(b)(3)(B) required the trial court to assess and decide whether corroborating circumstances clearly demonstrated the trustworthiness of the *content* of the hearsay statements before they were admitted, including whether the hearsay statements were fabricated. Rule 804(b)(3)(B) entrusts the trial court with the gatekeeping role for the admission or exclusion of this type of hearsay. Here, the trial court was presented with conflicting evidence on the controlling issue of trustworthiness, including an admission by the out of court declarant that, when he admitted to shooting, he lied in exchange for the promise of money. Given this evidence, we cannot say that the trial court abused its discretion

14

when it concluded that the hearsay statements were not trustworthy, and we reject Murphy's argument that the statements should have been admitted simply based on the strength of the evidence that Ellison actually made them.[7]

At trial, the State pointed to evidence suggesting that Ellison fabricated his involvement in the shooting at the direction of Wright and Murphy and that he did so in return for the promise of money. Specifically, when interviewed by Langford, Ellison claimed that his call with Wright was a "scheme" because he was "friends with them" and that Murphy and Wright were "supposed to give him money." Ellison claimed that Wright sent a letter to Santrez Hall "telling

---

[7] We recognize that Murphy also points to other evidence of corroboration, such as Kevin's and Glover's proffered testimony that Ellison told them he was shooting, Wright's testimony that Ellison was cleaning shell casings out of his car, Kevin's and Glover's testimony that Ellison had a 9mm gun, and Glover's testimony that Ellison was cleaning his hands with gasoline. While this evidence, if believed by the trial court, may have supported a different ruling on the admission of Ellison's hearsay statements, that does not mean that the trial court was required to accept this evidence and find that the content of the hearsay was in fact trustworthy. Rather, given the conflict in the evidence on this point, including evidence that Ellison was not in the car with Murphy at the time of the shooting, was not one of the shooters, and lied about his involvement in the shooting in exchange for the promise of money, the trial court was authorized to exercise its discretion and exclude the hearsay.

[Ellison] what [he] was supposed to say, so [he] said it," and at the beginning of Wright's recorded phone call to Ellison, before Ellison got on the phone, Wright can be heard telling someone named Black to talk to Hall to learn "what the plan is." Based on this evidence, the trial court was authorized to exercise its discretion and find that Ellison's statements were not sufficiently supported by corroborating circumstances clearly indicating that they were trustworthy.

Additionally, Murphy's multiple statements to law enforcement were inconsistent with each other and were inconsistent with the version of events suggested by Ellison's hearsay statements, providing the trial court with further reason to question the veracity of those statements and conclude that they were not supported by corroborating circumstances that "clearly indicate" their trustworthiness. In Murphy's first two statements to police, he claims he left the club with Wright and did not mention Ellison. In his third statement, which occurred after eyewitnesses identified him as the shooter in the passenger side of a dark-colored

16

car, he changed his story and claimed he left the club with Ellison, not Wright, and that he did not have a gun. Ellison, however, claimed that Murphy did have a gun and that Ellison was not the only person shooting that night. Given this conflicting evidence, combined with Ellison's admission that he fabricated the out of court statements in exchange for the promise of money, we conclude that the trial court did not abuse its discretion in finding that Ellison's statements were not trustworthy and therefore not admissible under Rule 804(b)(3)(B).[8] See *United States v. Tipton*, 572 F. App'x

---

[8] Further support for our holding that the proper inquiry under Rule 804(b)(3)(B) considers the trustworthiness of the content of the hearsay statements and not just the strength of the evidence showing that the statements were actually made is found in the Notes of the Advisory Committee on Federal Rule 804(b)(3). See *Almanza*, 304 Ga. at 559 n.6 ("[A]lthough Advisory Committee Notes are not binding precedent and cannot change the plain meaning of the law or rules, they are highly persuasive (unlike ordinary legislative history)."). These Notes characterize the trustworthiness requirement as "a requirement preliminary to admissibility" and state that "[t]he requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." Similarly, the Notes of the Advisory Committee with respect to the 2010 Amendment to Federal Rule 804(b)(3) state: "In assessing whether corroborating circumstances exist, some courts have focused on the credibility of the witness who relates the hearsay statement in court. But the credibility of the witness who relates the statement is not a proper factor for the court to consider in assessing corroborating circumstances. To base admission or exclusion of a hearsay statement on the witness's credibility would usurp the jury's role of

17

743, 748 (11th Cir. 2014) (affirming a trial court's decision to exclude hearsay evidence under Federal Rule 804(b)(3) because the declarant was "completely unbelievable"); *United States v. Berry*, 496 F. App'x 938, 942 (11th Cir. 2012) (affirming the trial court's exclusion of an out of court declarant's statements as not clearly corroborated because he recanted post-arrest statements about drug ownership in a follow-up interview with police and "allowing multiple, inconsistent statements by an unavailable witness could mislead the jury and confuse the issues").

(b) Murphy also claims that Ellison's statements should have been admitted under Rule 807, the residual hearsay exception. We conclude that, for the same reasons the trial court did not abuse its discretion in excluding this evidence under Rule 804(b)(3), it did not abuse its discretion in finding that this evidence did not possess the "guarantees of trustworthiness" required by Rule 807. See OCGA §

---

determining the credibility of testifying witnesses." As shown by this language, the focus of the Rule's trustworthiness requirement is not the veracity of the testifying witness who relays the hearsay in court but the trustworthiness of the content of the hearsay statements themselves.

18

24-8-807 (requiring statements to possess "equivalent circumstantial guarantees of trustworthiness" to qualify for admission); *State v. Kenney*, 315 Ga. 408, 415 (2023) ("[A] court must find that hearsay statements have guarantees of trustworthiness [that are] equivalent to those found in the other statutory exceptions to hearsay set forth in Rules 803 and 804 before they can be admitted under the residual exception." (cleaned up)). Compare *Kennebrew v. State*, 317 Ga. 324, 335 (2023) (concluding that trial court did not abuse its discretion in admitting evidence under Rule 807 where, among other things, there "was no evidence presented indicating that [the declarant] had any motive to fabricate his statements").

3. Murphy argues that the trial court erred in finding that the State did not violate *Brady* by failing to provide him with exculpatory evidence. Specifically, Murphy argues that the State's failure to provide him with Langford's audio-recorded interview with Shelley, as well as Langford's supplemental interview notes from that interview, constituted a *Brady* violation. Murphy also

19

argues that, because the State violated *Brady*, the trial court erred in denying Murphy's motion for a continuance to investigate Shelley's statements. These claims fail.

Prior to trial, Langford interviewed Shelley, who claimed that Ellison told him that both he and Murphy were shooting at the time of Brown's death. Langford recorded his interview with Shelley and provided a supplemental report on the interview to the State. The State claimed it did not have the report and did not provide the report in discovery. Murphy argued that he was unaware that the State interviewed Shelley or that Shelley had favorable evidence until the morning of trial.

On June 30, 2014 (more than a month before trial), Murphy sent the State a witness list that included Shelley's name. During a pretrial hearing the morning of trial, Murphy's counsel told the court that he wanted to call Langford as a witness because he "found out … a Ted Shelley was used by the police … to talk to Roosevelt Ellison." Murphy called Langford as a witness during this pretrial hearing, and Langford testified that Shelley contacted him in

October 2012 from jail to let Langford know that he had information about a homicide. Langford testified that he interviewed Shelley in October 2012, and Shelley stated that Ellison had told him "[Murphy] and the others had gotten into it," and "Murphy was shooting at the time of the incident and advised that [Ellison] was shooting, as well." Shelley indicated that the "only reason he knew about [the shooting] was because Roosevelt Ellison told him."

Murphy requested a continuance to speak with Shelley, and the State argued that Murphy "knew he was a witness, and they had an opportunity to speak with him," and "if they had taken the opportunity to speak with him ... he could have told them about this." The State also contended that it had no information about Shelley in Langford's investigative report. The trial court denied Murphy's motion for a continuance.

(a) Murphy first claims that the State violated *Brady* by not disclosing Shelley's interview or Langford's notes regarding that interview. To prevail on his *Brady* claim, Murphy must prove that:

(1) the State possessed evidence favorable to the

defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

*Schofield v. Palmer*, 279 Ga. 848, 852 (2005). "Evidence is not regarded as 'suppressed' by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence." *State v. James*, 292 Ga. 440, 442 (2013). "The burden of proof on these elements lies with the defendant," and "[w]e review a trial court's factual findings regarding a *Brady* claim for clear error but review the court's application of the law to the facts de novo." *Harris v. State*, 313 Ga. 653, 664 (2022).

Murphy's claim fails because he cannot establish that he could not have obtained Shelley's statements himself with reasonable diligence. Here, Murphy's trial counsel listed Shelley on a witness list that he emailed to the State on June 30, 2014. Shelley's existence was therefore known to Murphy for more than a month prior to trial, and Murphy could have interviewed Shelley and obtained this

testimony by exercising reasonable diligence. See *Swindle v. State*, 274 Ga. 668, 670 (2002) (no *Brady* violation when the State did not disclose the whereabouts of a potential alibi witness where the witness "was known to Swindle and other defense witnesses, and he apparently was as available to the defense as he was to the prosecution"). See also *James*, 292 Ga. at 442 (no *Brady* violation where co-defendants received two pages of a medical examiner's report and not the third page when the report was clearly paginated, putting them on notice that a page was missing, and where third co-defendant obtained the missing page).

(b) Murphy also argues that, as a result of the alleged *Brady* violation, the trial court should have granted his motion for a continuance so that he could investigate Shelley's statements and produce him as a witness at trial.

"In considering a motion for continuance, the trial court enjoys broad discretion and may grant or refuse the motion as the ends of justice may require." *Mann v. State*, 307 Ga. 696, 703 (2020). "To obtain a new trial based upon the denial of a motion for a

continuance, an appellant must show not only a clear abuse of discretion on the part of the trial court in denying the motion but also that he was harmed by that denial." Id. Here, Shelley was known to Murphy for more than a month prior to trial, and Murphy could have easily investigated what he knew about the case prior to trial. Given these facts, we cannot say that the trial court abused its discretion in denying Murphy's request for a continuance. See *Mann*, 307 Ga. at 703–04. Accordingly, this enumeration is without merit.

4. Murphy argues that the trial court erred in instructing the jury that "[p]resence, companionship and conduct before and after the offense are circumstances from which one's participation and criminal intent may be inferred." This enumeration is without merit.

We review properly preserved challenges to jury instructions de novo. See *Campbell v. State*, 320 Ga. 333, 347 (2024). Murphy objected to the presence and companionship instruction both at the charge conference and after the instruction was given to the jury by the trial court, arguing that the instruction, as given, was

inconsistent with the pattern charge on mere presence also given by

the court. Murphy argues that the correct legal theory is as follows:

> It is true mere presence at the scene of a crime, even coupled with knowledge and approval, is insufficient to convict one of being a party. However, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. A person will not be presumed to act with criminal intention, but the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

At trial, the court gave the following instructions relevant to

intent:

> This defendant will not be presumed to have acted with criminal intent, but you may find such intent, or the absence of it, upon a consideration of words, conduct, demeanor, motive and other circumstances connected with the act for which the accused is being prosecuted.

> Every person is presumed to be of sound mind and discretion, but this presumption may be rebutted. You may infer if you wish to do so that the act of a person of sound mind and discretion are the product of that person's will, and a person of sound mind and discretion intends the natural and probable consequences of those acts.

> Whether or not you make any such inference or inferences is a matter solely within your discretion.

If one intentionally commits an unlawful act, yet the act harmed a victim other than the one intended, it is not a defense that the defendant did not intend to harm the actual person injured.

Presence, companionship and conduct before and after the offense are circumstances from which one's participation and criminal intent may be inferred.

The trial court later gave the following instructions on mere presence and association:

A jury is not authorized to find a person who is merely present at the scene of the commission of a crime at the time of its perpetration guilty of consent in concurrent with the commission of the crime unless the evidence shows beyond a reasonable doubt that such person committed the alleged crime, helped in the actual perpetration of the crime, or participated in the criminal endeavor.

A jury is not authorized to find a person who is merely associated with other persons involved in the crimes, involved in the commission of a crime, guilty of consent in or concurrence in the commission of a crime unless the evidence shows beyond a reasonable doubt that such person helped in the actual perpetration of the crime or participated in the criminal endeavor.

The instructions given by the trial court do not materially differ from those which Murphy claims should have been given and do not

constitute sufficient grounds for reversal. Although the trial court did not give the instructions in the order advanced by Murphy, that is not grounds for a new trial, at least absent a showing that the order in which they were given rendered the instructions erroneous. See *Pruitt v. State*, 282 Ga. 30, 33 (2007) (rejecting appellant's challenge to the "order in which the trial court gave certain jury instructions"). Moreover, these jury instructions are not contradictory. In *Pruitt*,

> The trial court charged the jury that a defendant's mere presence at the scene of the commission of a crime did not authorize finding the defendant guilty unless the evidence established beyond a reasonable doubt that the defendant committed the crime, helped in the commission of the crime, or participated in the criminal endeavor. The trial court then informed the jury of the elements of the various crimes the defendants were charged with committing, and thereafter instructed the jury that participation in the criminal intent could be inferred from presence, companionship, and conduct before and after the commission of the offenses.

282 Ga. at 33. Although the appellant in *Pruitt* argued that these jury instructions were "contradictory" and "incomprehensible," this Court held that the two charges were "accurate statements of law

27

and are not contradictory." Id. As in *Pruitt*, while these charges "are complementary and are often stated together as a single principle of law," their separation does not make "the resulting charge 'incomprehensible.'" Id.

Murphy also argues that the trial court misstated the presence and companionship instruction. Although the State requested that the jury be charged that "[p]resence, companionship and conduct before and after the offense are circumstances from which one's participation *in the* criminal intent may be inferred," the trial court instead gave the instruction that "[p]resence, companionship and conduct before and after the offense are circumstances from which one's participation *and* criminal intent may be inferred."

"[C]riminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense." *Baker v. State*, 320 Ga. 156, 161 (2024) (citation and punctuation omitted). Thus, even though the trial court did not use exactly the same language as was requested by the State, the charge as given did not misstate the law. Moreover, the trial court also instructed

the jury that Murphy "will not be presumed to have acted with criminal intent" but the jury may "find such intent, or the absence of it, upon a consideration of words, conduct, demeanor, motive and other circumstances connected with the act for which the accused is being prosecuted." The trial court also adequately instructed the jury on the State's burden to prove Murphy guilty beyond a reasonable doubt. This enumeration therefore fails because, as a whole, the jury instructions adequately instructed the jury on intent. See *Pruitt*, 282 Ga. at 33.

5. Murphy argues that the trial court erred in denying his motion for a directed verdict as to Count 4 of the indictment because it fails to identify the victims of the offense. This enumeration fails.

Count 4 of the indictment alleges that Murphy "did make an assault upon several individuals leaving Club 5150 … with an unknown type handgun, a deadly weapon, by firing the handgun at Club 5150 as the individuals were leaving the club." At trial, Murphy filed a motion for directed verdict as to this count, arguing that it was deficient because it failed to "state any particular people

[that] were shot at." The trial court denied the motion. On appeal, Murphy argues that the trial court erred in denying that motion because Count 4's failure to identify individuals that Murphy allegedly assaulted does not adequately inform him of the nature of the charge against him for double jeopardy purposes.

Murphy's claim fails, however, because "a motion for directed verdict of acquittal is not the proper way to contest the sufficiency of an indictment. A motion for directed verdict of acquittal addresses the sufficiency of the evidence, not the sufficiency of the underlying indictment." *Adkins v. State*, 279 Ga. 424, 426 (2005) (cleaned up). Thus, the trial court did not err in denying Murphy's motion.[9] See id. (holding that a motion for a directed verdict was not the appropriate way to challenge an indictment that was allegedly

---

[9] At trial, Murphy's counsel also moved for a directed verdict as to Count 4 of the indictment because "there is insufficient evidence." On appeal, however, Murphy challenges only the trial court's denial of his motion because the indictment fails "to adequately inform Murphy of the nature of the charge against him." Thus, we decline to address whether the trial court erred by denying Murphy's motion for a directed verdict as to Count 4 on the basis that the evidence was insufficient to support a conviction on that Count. We also note that Murphy did not file a pretrial special demurrer to challenge the sufficiency of this Count of the indictment.

insufficient because it failed to identify victims by name).

6. Finally, Murphy argues that his trial counsel rendered constitutionally deficient assistance by failing to call two witnesses, Phillip Korte and Tavares Jones, to testify that the shooter was in a white car because their testimony would have contradicted the testimony of the State's eyewitnesses, who identified Murphy as the shooter from a dark-colored car. For the reasons that follow, we disagree.

A defendant claiming ineffective assistance of counsel must prove deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To prove deficient performance, a defendant must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. This requires Murphy to "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Wilson v. State*, 313

Ga. 319, 322 (2022) (citation and punctuation omitted). "Importantly, in the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." Id. (citation and punctuation omitted). "If either *Strickland* prong is not met, this Court need not examine the other prong." *Palmer v. State*, 303 Ga. 810, 816 (2018).

During the hearing on Murphy's motion for new trial, Murphy's trial counsel testified that, during discovery, he learned that Korte told law enforcement that the shooter was in a white car. Murphy's trial counsel also testified that he learned that Jones likewise said that the shooter was in a white car.

Murphy's trial counsel testified that he wanted to "focus" on the defense theory that "the gun was being held by a different hand" and that he was "trying to focus the jurors['] attention on the angle of Roosevelt Ellison because … [he] believe[d] that was the best." Trial counsel further testified that he tried to "keep the jury's attention on facts that are important, and also not to call people that

may leave me holding it." Trial counsel acknowledged that testimony that the shooter's car was white was "contradictory" to testimony that it was black or dark-colored, but stated that "we always have to strategically decide what you're going to try to focus the jury's attention on."

"[T]he decision of whether to call a witness to testify at trial is a matter of trial strategy and tactics, and such a strategic and tactical decision cannot be deemed deficient performance unless the decision is so unreasonable that no competent attorney would have made it under similar circumstances." *Roberts v. State*, 296 Ga. 719, 724 (2015) (citation and punctuation omitted). Here, trial counsel testified that he made the strategic decision to focus on the defense theory that Ellison, not Murphy, was the shooter and believed that to be a stronger defense than the argument that the shot came from a white car, not a dark-colored car, as presenting both defenses might discredit the defense and confuse the jury. We cannot say that trial counsel's strategy was objectively unreasonable, especially in light of Murphy's own statements to investigators that he left the

33

club with Ellison in a dark-colored vehicle such that testimony that the shooter rode in a white car may very well have discredited Murphy's primary defense. Accordingly, Murphy has not demonstrated that his trial counsel's performance was deficient, and his claim of ineffective assistance of counsel therefore fails.

7. Citing *State v. Lane*, 308 Ga. 10 (2020), Murphy argues that, "in weighing the prejudicial effect on Murphy's trial, trial counsel's deficiency is to be considered cumulatively with any errors by the trial court." "In considering a claim of cumulative error, we evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors." *O'Neal v. State*, 316 Ga. 264, 271 (2023). Because none of Murphy's claims of error have succeeded and he has not shown that his counsel performed deficiently, "there are no errors to aggregate, and his claim of cumulative error also fails." Id.

*Judgment affirmed. All the Justices concur.*